[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 10, 2012
JOHN LEY
CLERK

No. 09-13407

_____

D. C. Docket No. 08-20044-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN RENE CARO,
MAYTEMAR CORPORATION,
d.b.a. La Bamba Check Cashing,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(January 10, 2012)

Before BARKETT and HULL, Circuit Judges, and SCHLESINGER,* District Judge.

SCHLESINGER, District Judge:

## I. INTRODUCTION

During the building boom in South Florida in the early 2000s, many within the construction industry played fast and loose with federal and state regulations to maximize profits and minimize taxes. These companies were able to find willing partners in this pursuit, and Juan Rene Caro ("Caro") was accused of being one of these partners. Caro's scheme allegedly involved using fictitious or "shell" construction corporations to avoid taxes and insurance costs.

Normally, employers withhold from employees' paychecks monies paid into the federal treasury; social security and payroll taxes. These legitimate construction companies, however, were trying to avoid these "obstacles," so that they could employ illegal aliens. One cannot simply write a payroll check to an illegal alien, as such employment is illegal. In addition, these illegal aliens could not open legitimate bank accounts where they could either deposit or cash paychecks.

If the alleged scheme worked properly, all of these "obstacles" would be overcome. A legitimate construction company would be approached by Caro or an

---

\* Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

associate and offered an alternative to paying the taxes and insurance costs associate with employees. Rather than pay employees by check, the legitimate construction company would write a check to a shell corporation making it appear that the shell company was a subcontractor and the employer of the legitimate construction company's employees.

The shell corporation would allegedly cash that check at Caro's check cashing store, or another check cashing store. A percentage of the face value of the check was "charged" as a fee, with the remaining cash returned to the shell corporation. The shell corporation, in turn, provided the cash to the legitimate construction company. The cash, in its final voyage of the journey, was payed to employees, including illegal aliens.

In addition to evading payroll taxes, the scheme allegedly allowed the legitimate corporation to avoid the expense of workers' compensation insurance. This was accomplished when the shell company fraudulently procured workers compensation insurance and permitted the legitimate company's employees to work under that insurance certificate.

The shell companies, on the other hand, were then left holding the bag. They were responsible for the payroll taxes and insurance premiums but never paid them. Instead, when all the unpaid taxes and premiums drew scrutiny, usually within a year or eighteen months, the shell company simply dissolved leaving these

3

debts unpaid. Another shell company would quickly be incorporated and the cycle would begin anew.

The flaw in Caro's scheme was underestimating the Internal Revenue Service ("IRS"). Financial institutions are required to complete and file with the IRS a currency transaction report ("CTR") for currency transactions involving more than $10,000. Caro allegedly made material misrepresentations in the CTRs for the transactions with these shell companies, which eventfully led to him being investigated by the IRS and being charged in this case.

## II. CHARGES

A thirty-three count Superceding Indictment was returned by a federal grand jury based upon this alleged scheme.

### A. Count One - Conspiracy

Count One charged a conspiracy between Caro, Alfredo Filomeno Gonzalez, Jose Jorge Chaoui, Oscar Alberto Valle, Meylin Maria Morales, as well as Maytemar Corporation, d/b/a La Bamba Check Cashing ("La Bamba"), and others; in violation of 18 U.S.C. § 371. It was alleged that the conspiracy existed to willfully violate currency transaction reporting requirements; in violation of 31 U.S.C. §§ 5313(a); 5324(a)(2), (d)(2). The purpose of the conspiracy allegedly was to unlawfully enrich the co-conspirators by earning substantial commissions, or "fees," by cashing checks for these shell corporations.

4

In furtherance of the conspiracy, co-conspirators filed CTRs for transactions with the shell companies that contained materially false statements and omissions of material facts.

It was alleged from August 2005 until January 2008, that the co-conspirators used various shell corporations and allowed customers to write checks payable to those shell companies. The advantage of this was to make it appear that the shell company was an actual subcontractor, engaged in construction work, for the legitimate company. These checks were cashed for a "fee," at La Bamba, or an associated check cashing store, despite not being payable to the person conducting the transaction.

Thereafter, Caro and other co-conspirators allegedly caused La Bamba to file CTRs falsely stating that the parties involved in the check cashing transaction were the shell companies and their nominee owners. This misrepresented the true source of the money and the true identities of the individuals conducting the transaction. From August 2005 until January 2008, the co-conspirators filed false CTRs that reflected transactions totaling more that $132.7 million. In addition, Caro payed a portion of the "fee" from the transaction to the co-conspirator as payment for the use of the shell company.

The Superceding Indictment alleged twenty-one overt acts of the conspiracy. These overt acts listed activities such as: Caro meeting with Miguel Obispo, the

5

owner of an associated check cashing store, and discussing cashing checks in exchange for cash at an agreed fee; filing false CTRs for transactions involving Fast Construction, Group, Inc. ("Fast"), Spirit Construction Group Corporation ("Spirit"), SB Construction Group Corporation ("SB"), and PAW Construction ("PAW"); co-conspirator Chaoui's accepting checks on July 23, 2007, from Obispo payable to the shell companies; and Caro giving Obispo a business card from DJ Construction Group, Inc. ("DJ") for the purpose of Obispo contacting Valle and becoming a part of this conspiracy.

## B. Counts Two - Seventeen

Counts Two through Seventeen charged Caro, Gonzalez, Chaoui, Valle, Morales, and La Bamba with causing and attempting to cause a domestic financial institution to file CTRs that contained materially false statements and omissions of material facts; in violation of 31 U.S.C. §§ 5313(a); 5324(a)(2), (d)(2); and 18 U.S.C. § 2. Count Two alleged that Caro and Chaoui, on April 6, 2007, accepted checks payable to Spirit totaling $79,965, and caused and attempted to cause the filing of a false CTR from that transaction stating that Marvin Marroquin had cashed the check.[1]

Count Six alleged that Caro and Chaoui accepted checks payable to Spirit,

---

[1] We need not address Count Three as only Chaoui was charged in that count and the jury could not reach a verdict on that count. Nor must we address Counts Four, Five or Seven because Caro was not convicted of those charges.

6

on May 18, 2007, in the amount of $233,836, and caused and attempted to cause a false CTR from that transaction to be filed stating that Marvin Marroquin had cashed the check.[2]  Count Eight alleged that on July 12, 2007, Caro accepted checks payable to PAW in the amount of $60,120, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.[3]  Count Nine alleged that on July 31, 2007, Caro accepted checks payable to PAW in the amount of $46,050, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.  Count Ten alleged that on August 15, 2006, Caro and Gonzalez accepted checks payable to PAW in the amount of $56,233, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.  Count Eleven alleged that on August 16, 2007, Caro and Gonzales accepted checks payable to PAW in the amount of $44,325, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.  Count Twelve alleged that on August 22, 2007, Caro and Gonzales accepted checks payable to PAW in the amount of $56,042, and  caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.  Count Thirteen alleged that on

[2] Count Six is also Count One's overt act six.

[3] Count Eight is also Count One's overt act nine.

7

August 23, 2007, Caro and Gonzales accepted checks payable to PAW in the amount of $41,208, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check. Count Fourteen alleged that on September 5, 2007, Caro and Gonzales accepted checks payable to PAW in the amount of $107,812, and caused and attempted to cause a false CTR to be filed from that transaction stating that Carlos Martinez cashed the check.[4] Count Fifteen alleged that on September 5, 2007, Caro, Valle, and Morales accepted and cashed checks payable to DJ in the amount of $100,288, and caused and attempted to cause the filing of a false CTR that stated that G.V. had cashed the check. Count Sixteen alleged that on September 26, 2007, Caro, Gonzalez, Valle, and Morales accepted and cashed checks payable to DJ in the amount of $72,447, and caused and attempted to cause the filing of a false CTR that stated that G.V. had cashed the check. Count Seventeen alleged that on September 26, 2007, Caro and Gonzales accepted checks payable to PAW in the amount of $55,015, and filed a false CTR from that transaction stating that Carlos Martinez cashed the check.

### C. Counts Eighteen - Thirty-Three

Counts Eighteen through Thirty-Three charged La Bamba with filing false CTRs; in violation of 31 U.S.C. §§ 5313(a); 5322(b); and 18 U.S.C. § 2. These

---

[4] Count Fourteen is part of Count One's overt act seventeen.

counts involve the same transactions alleged in Counts Two through Seventeen, in which Caro was a Defendant but not La Bamba.

### III. PROCEEDINGS

Caro, Gonzalez, Chaoui, and La Bamba were jointly tried during a lengthy jury trial.[5] *Vior dire* began on November 5, 2008, closing arguments were concluded on January 23, 2009, and the jury returned verdicts on February 9, 2009. The Government's witness list included 38 witnesses, and its exhibit list contained well over 600 exhibits.[6] By their verdict, the jury found Caro guilty of Counts One, Two, Six, and Eight through Seventeen. La Bamba was convicted of Counts One, Eighteen, Nineteen, and Twenty-Two through Thirty-Three.[7] The jury could not reach verdicts as to Gonzalez and Chaoui, and the District Court declared a mistrial as to them. They both subsequently plead guilty to other offenses. Caro was sentenced to a 216-month total term of imprisonment, which was below the applicable sentencing guideline range, and La Bamba was placed on five years

---

[5] Valle and Morales did not appear for trial and were deemed fugitives.

[6] However, some of these exhibits like Exhibit 3 contain as many as 200 different CTRs which were bundled into a single exhibit. It appears that while over 600 exhibit numbers were used, many of these contain multiple single page CTRs, like exhibit 12 which contains over 208 different single page CTRs. So for record purposes, what appears to be two exhibits combined they contained in reality in excess of 400 separate transactions which were identified individually by witnesses using a stamped number on each sheet.

[7] The Government provided an overabundance of evidence involving repeated filings of false CTRs, but for the purposes of this Opinion we need only address the Counts of which Caro and La Bamba were convicted.

probation.

Appellants Caro and La Bamba challenge their convictions on the grounds that the District Court committed multiple errors throughout the trial. Specifically, appellants maintain: there was insufficient evidence to support the convictions; that the District Court permitted the government's expert witness to impermissibly substitute his own ideal standard for one reflecting "real world" financial operations; that the District Court erred by allowing cross-examination into defense counsel's violation of the rule of sequestration and the cross-examination of Caro's industry expert about a 27-year-old felony conviction; the District Court improperly excluded the testimony as to the presence of OSHA inspectors at construction sites; the District Court improperly struck a portion of Caro's closing argument; the District Court permitted a government witness to testify about Caro's right to remain silent; that the government committed numerous instances of misconduct; the District Court erred by failing to sever the trial as to the co-defendants; that jury deliberations were tainted and the District Court improperly destroyed a partial verdict; and that the District Court improperly instructed the jury.

Appellants also challenge their sentences contending that the District Court erred in calculating the sentencing guidelines by characterizing Caro as an organizer/leader of a fraudulent financial reporting conspiracy, in applying a

two-level obstruction-of-justice enhancement, and imposing a 216-month sentence which was procedurally and substantively unreasonable.

We reject Appellants' attacks on their convictions and sentences and conclude that they should be affirmed.

## IV.  FACTUAL BACKGROUND

The following evidence was presented at trial in support of the charges.

### A.  Bank Secrecy Act

The Currency and Foreign Transactions Reporting Act ("Bank Secrecy Act") enacted in 1970, Pub.L. 91–508, Tit. II, 84 Stat. 1118, delegates to the Secretary of the Treasury the authority to establish regulations for financial institutions.  One of those regulations directs that financial institutions must complete and file with the IRS a CTR for currency transactions involving more than $10,000.  31 U.S.C. § 5313; old 31 C.F.R. 103.22 (75 FR 65806-01).  All financial institutions, including check-cashing stores, are subject to Bank Secrecy Act ("BSA") regulations and reporting requirements.

The BSA imposes duties upon financial institutions to keep certain records, obtain particular information, file reports, and establish an effective anti-money laundering compliance program.  A financial institution is required to have a compliance officer, who is responsible for the institution's following all BSA requirements.  Although the compliance officer is not required to personally

11

prepare every CTR, that officer is required to sign the CTR and oversee the process. A financial institution's officers and directors must ensure that the BSA's requirements are fulfilled. Although BSA duties may be delegated, financial institutions retain ultimate responsibility for compliance and no agency relationship may cancel that responsibility.

Financial institutions must generate a "paper trail" to identify potential taxable income and to prevent financial crimes. The Code of Federal Regulations sets forth the instructions for completing and filing CTRs and directions are attached to the form. Within the IRS, the Detroit Computer Center maintains a major database of all CTR information called the Currency Bank Retrieval System ("CBRS"), which is available to law enforcement agencies with jurisdiction to investigate financial crimes.

Peter D. Djinis, a government expert, explained to the jury that the BSA required financial institutions to report currency transactions over $10,000 to the government.[8] He explained that a CTR must identify the date, transaction amount, the person or entity on whose behalf the transaction took place, and the individual who was physically present at the institution to conduct the transaction.[9]

---

[8] It was stipulated that La Bamba was a "domestic financial institution" under the Bank Secrecy Act and subject to its CTR-reporting requirements.

[9] IRS agent William Rondon explained that a CTR may properly be filed within fifteen days of the date of a transaction.

Each CTR consists of three parts. Part 1 is concerned with identities of parties to a transaction; section A requires the financial institution to identify and report the beneficiary of the transaction, meaning the party on whose behalf the transaction is conducted, while section B requires the financial institution to identify and report the actual conductor of the transaction, that is, the party who is either depositing and/or receiving more than $10,000 in currency.

Part 2 requires the date, the amount of the transaction, and the form of the transaction. If the aggregate amount of different transactions by the same entity during the same day exceeds $10,000 in currency, then a CTR must be filed. This prohibits the structuring of transactions of less than $10,000 to avoid reporting what in actuality is a series of daily transactions that amount to $10,000 or more.

Part 3 requires the names of the financial institution where the transaction occurred, the person completing the form, and the person approving the completion and filing of the form. The form provides extra pages to list multiple names if more than one entity is involved in the transaction or if multiple financial institutions are involved.

Djinis, further, explained that a financial services institution is required to know its customers. An institution must not simply identify its customers, but it has an obligation to understand who the customers actually are and identify the nature of their business and activity. Customers who engage in repeated

13

transactions involving large amounts of cash generate greater risk and exposure for the financial institution and it is these customers who the institution must place under greater scrutiny. Key indicators of risky transactions are amounts, frequency, and volume of a customer's transactions. Thus, for money services businesses, like check-cashing stores, they must be cautious that they are doing business with the persons who are complying with the CTR requirements rather than trying to avoid them.

Finally, Djinis hypothesized that if La Bamba handled more than $600 million in transactions, as the government suggested, that volume was "exceptionally high" for the services La Bamba offered to the public. That volume of the checks should have prompted La Bamba to investigate the underlying facts of the transactions and the parties involved.

### B. IRS Investigation

In 2006, an IRS task force began investigating the activities of South Florida check-cashing stores. Information obtained from the CBRS database revealed that hundreds of CTRs for transactions exceeding $10 million had been filed for DNC Construction ("DNC"), Fast, and Spirit. Despite the volume of transactions, these entities did not appear to be engaged in any actual construction work. This anomaly provided the IRS with a starting point for their investigation.

### 1. La Bamba

Initially, the investigation revealed that La Bamba, a money service business that cashed checks, was a Florida corporation. The main store and corporate offices were located in Miami. La Bamba maintained six branch stores and a fleet of mobile vans that visited construction sites to cash checks.

Caro, the Owner and President of La Bamba, oversaw its daily operations. Defendant Chaoui, with over 28 years experience as a bank officer, was La Bamba's compliance officer. Gonzalez, Caro's brother-in-law and former licensed contractor, was in charge of supervising the cashing of checks.

They were, however, not the only participants in the scheme. Oscar Valle and his wife, Meylin Maria Morales, set up shell companies and functioned as recruiters to bring new "clients" to Caro. Despite being the linchpin that held the scheme together, Caro needed the help of all his co-conspirators because he could not have carried on such a widespread and sophisticated scheme alone.

### 2. Spirit Construction

In December 2006, IRS Agent William Rondon interviewed Spirit's President, Marvin Marroquin. Marroquin cooperated with the government and testified at trial. Marroquin testified that his brother-in-law, Alfredo Ortega, had created Spirit with Marroquin's driver's license and social security number. Spirit was created not for construction work, but for the sole purpose of cashing checks to evade taxes. For this reason, Ortega explained to Marroquin that Spirit could

15

remain in existence for about a year and a half, but then Marroquin, as President, should leave the country before the IRS discovered Spirit's activity.

Ortega obtained a workers' compensation insurance policy for Spirit and had Marroquin sign approximately 40 blank checks for Spirit. At Ortega's request, Marroquin also obtained a rubber stamp with his signature so that Ortega could cash checks without Marroquin's signature, should Marroquin need to leave the country. As Spirit's President, Marroquin received a percentage of Spirit's cashed checks as compensation for his part in the scheme.

A form with Marroquin's name and signature was found in a La Bamba file, and La Bamba filed CTRs for transactions worth more than over $20.3 million on Spirit's behalf. Marroquin testified this was not accurate as he had never visited La Bamba, he did not know Caro, Gonzalez, or Chaoui, nor did he authorize La Bamba to cash checks for Spirit.

### 3. Cashflow Financing

Based upon information gleaned from the CBRS database, the IRS also started investigating Cashflow Financing, Inc. ("Cashflow"), another check cashing institution. In March 2007, Cashflow was searched and Miguel Obispo, its owner, was detained and interviewed. In the end, Obispo agreed to cooperate with the government in an undercover capacity. Based on that cooperation, the IRS installed cameras and microphones in Cashflow, and Obispo was personally

16

equipped with a recording device.[10]

According to Obispo's testimony, Cashflow had two types of corporate clients – regular and irregular. The regular clients cashed $5,000 to $7,000 checks every two weeks. The irregular clients cashed checks from $30,000 to $200,000 every week. The irregular clients included: DNC Construction; Fast; Spirit; SAN Construction; WF Construction; Baba Construction; and Four-by-Four Construction. Not surprisingly, these so-called construction clients were not actually engaged in construction work, but were shell companies that could be used as subcontractors for the purposes of cashing checks.

Over time, 90% of Cashflow's business was derived from these irregular companies. The only hindrance to Obispo's growing business was limitations imposed by his bank. The bank established an $180,000 ceiling on Cashflow's weekly check deposits. This ceiling forced Obispo to seek alternative sources of funds, and he found willing partners in Caro and La Bamba.

### 4. La Bamba

In April 2005, one of Obispo's friends introduced him to Caro. Caro agreed to supply Obispo with $100,000 to $150,000 cash weekly, in order to allow Cashflow to cash checks without his bank's interference. Obispo borrowed the

---

[10] These devices recorded over 100 undercover meetings between Obispo and La Bamba staff, approximately 300 telephone conversations, and 380 DVDs that showed numerous meetings between Obispo and Cashflow customers.

cash from La Bamba on Friday and repaid it, along with 1.5% interest, the following Wednesday.

Despite Obispo's cash borrowing arrangement, the bank's deposit restrictions, mentioned above, continued to curtail Cashflow's activities. In August 2005, Obispo and Caro further attempted to circumvent these restrictions. No longer would Obispo pick up cash from La Bamba, now he would bring the checks to Caro at La Bamba for deposit and receive cash in return.

These corporate checks Obispo delivered to La Bamba emanated from the shell companies. While he never explicitly divulged this to Caro, Obispo believed the two had an "understanding" based on the amount of currency changing hands. Caro acknowledged the fictitious nature of the companies when he described to Obispo that his companies were "miquimbin," meaning phony or fictitious companies.[11]

Now that Obispo was bringing checks written to the shell companies directly to La Bamba, the CTRs for the transactions were prepared and filed by La Bamba. Obispo understood that La Bamba would prepare the CTRs to remove him and Cashflow from the paper trial. Instead, the CTRs would be in the name of the shell corporation. Not yet cooperating with the IRS, Obispo was intent on actively

---

[11] No source language was identified for this term. However, according to Obispo, "Miquimbin" was a word in Caro's vocabulary. He explained that "out in the street, in everyday slang, it means things that come from bad origins or misbegotten things."

deceiving the IRS and these false CTRs would facilitate that by indicating the person to whom the check was written was actually withdrawing the money and not Obispo.

Obispo was aware that the CTRs being filed based on his transactions with Caro and La Bamba were inaccurate. To correctly record these transactions, two CTRs should have been filed. One detailing the La Bamba to Cashflow transaction. And a second from Cashflow providing the true identity of the person who received the currency. Instead of following the proper procedure, Obispo provided La Bamba with the information to generate and file a single, false CTR.[12]

This arrangement between Obispo, as a co-conspirator, and La Bamba lasted from August 2005 to March 22, 2007, when the IRS intervened.[13] But Obispo's dealings with Caro and La Bamba were far from over. From April through November 2007, Obispo visited La Bamba in his customary manner; the difference was he was now working for the IRS and wearing a recording device.

On April 5, 2007, Obispo paid his first visit to La Bamba as an informant, and he brought with him fourteen checks totaling $129,544.58; including checks

---

[12] The information consisted of: the tax or employer identification number for the fictitious company; the corporate officer's driver's license; the company's articles of incorporation; and its workers' compensation insurance certificate.

[13] On March 22, 2007, a search warrant was executed by the IRS at Cashflow, and Obispo agreed to become a government informant.

made payable to Spirit. On April 6, 2010, Obispo again visited La Bamba bringing with him checks totaling $227,079.76.

Based on these transactions, La Bamba prepared and filed several CTRs.[14] One particular CTR, the subject of Count Two of the Superseding Indictment, lists a transaction dated April 6, 2007. This CTR covers the cashing of checks, payable to Spirit, in the amount of $79,965.00. Yet the CTR falsely reflects that Marroquin, Spirit's President, conducted the transaction. Obispo is not identified on the form and he actually conducted the transaction.

On May 3, 2007, Obispo returned to La Bamba with checks, including some payable to SB. Obispo provided La Bamba the necessary paperwork to make the false CTRs for SB, including a copy of SB's articles of incorporation, a copy of the driver's license for Salvador Mata, SB's corporate officer, and a copy of Mata's social security card. The CTR La Bamba filed in connection with these checks falsely stated that Mata had conducted the transaction. Again Obispo was eliminated from being identified as part of the transaction.

On Obispo's May 16, 2007, visit to La Bamba, Caro changed the names of the payor on four of Obispo's checks to avoid bank suspicion. The checks had originally been made payable to La Bamba from Cashflow to avoid bank

---

[14] Government's Exhibit 3 indicates that La Bamba filed seven CTRs for transactions involving Spirit from April 5, 2007, until April 20, 2007.

suspicion. To prevent the need for future alterations, Caro directed Obispo to use different names on the checks and to deliver them sporadically. Caro instructed Obispo to mark his checks with the initials "M.H." on the back; these initials stood for Obispo's friend who introduced him to Caro. In that way, Caro knew they were Obispo's checks. Caro, further, suggested to Obispo that he make the checks payable to Spirit to make it appear that Cashflow had given Spirit cash and was depositing the checks at La Bamba. This practice would discourage further bank inquiry.

On May 18, 2007, Obispo returned to La Bamba, bringing $404,204.23 in checks; including two from Cashflow to Spirit. Caro obtained from Obispo the information for the CTRs, and directed Obispo to write the other checks from Cashflow in his own handwriting. When Obispo asked Caro the name of the payee, Caro told him that he could make out the check to "whichever one you want." Obispo interpreted this comment to mean any fictitious company he wanted so Obispo chose Spirit.

At least one CTR was filed by La Bamba with a transaction date of May 18, 2007. That CTR falsely reflected that Marroquin, from Spirit, presented checks for $233,836.00 to La Bamba that day, and is the subject of Count Six.

In June 2007, Obispo disclosed to Caro that he and a friend had formed PAW Construction. Obispo explained that PAW was "just like Spirit," a shell

21

company that could be used to evade taxes and the payment of workers' compensation insurance. Obispo touted the virtues of PAW, and assured Caro that PAW was insured. Unbeknownst to Caro, PAW was created by IRS agents to further its investigation. PAW was registered under the fictional name "Carlos Martinez;" which was an alias used by IRS Special Agent Charles Torres. Checks would be written to PAW from other IRS "undercover" companies, also created for the investigation. The bank accounts for these undercover companies were funded to ensure that the checks made payable to PAW would clear the payors' bank accounts.

Not surprisingly Caro and La Bamba willingly accepted checks made payable to PAW. On July 12, 2007, Obispo presented eight PAW checks to La Bamba. Caro only accepted two of the checks because of his concern about his bank becoming suspicious. For those two checks, however, CTRs were prepared at La Bamba that falsely identified Carlos Martinez, PAW's corporate officer, as conducting the transaction when it actually was Obispo. The CTR identified the correct amount of the transaction, $60,120, and was signed by Chaoui, and it is the subject of Count Eight.

Obispo returned to La Bamba, on July 31, 2007, with two more PAW checks. Again, the CTR prepared and recorded by La Bamba falsely stated the transaction had been conducted by Carlos Martinez, not Obispo. This CTR is the

subject of Count Nine.

Obispo repeatedly visited La Bamba with PAW checks from June through November 2007. For all the PAW checks, La Bamba prepared and filed CTRs that falsely identified Carlos Martinez as having conducted the transactions, when in reality it was Obispo.[15]

On one occasion, Obispo brought PAW checks to La Bamba that intentionally had not been endorsed. In Gonzalez's presence, Obispo signed them Carlos Martinez. On Obispo's last trip to La Bamba, on November 8, 2007, the checks to PAW had again not been endorsed and Caro drew that to Obispo's attention. In Caro's presence, Obispo signed the checks Carlos Martinez.

From June to November 2007, La Bamba filed 44 CTRs for PAW involving transactions of $3.5 million. All the CTRs falsely stated that Carlos Martinez, PAW's corporate officer, conducted the transactions when it was Obispo who had conducted them. These CTRs from this period are the subject of Count Ten, Eleven, Twelve, Thirteen, Fourteen, and Seventeen.

During the fall of 2007, Caro offered to purchase Cashflow. While discussing Cashflow's worth, Caro questioned the profit Obispo realized from the checks he cashed for legitimate companies. Caro estimated Cashflow cashed about

---

[15] All of the CTRs filed by La Bamba on the PAW transactions stated that Elaine Becerra was the preparer and Chaoui was the approving official.

$1 million a month in checks, without including the "strange people." Caro stated that one could not rely upon the "miquimbines," because they are "here today and gone tomorrow." When Obispo suggested that the "strange people" possessed some value and that Caro too had "strange people," Caro retorted, "No, I no longer have anything."

Obispo was perplexed by this comment. Caro was apparently denying having shell companies within his business, but Caro repeatedly accepted Obispo's checks to them. Caro explained that he had to be careful because his actions were scrutinized under a "magnifying glass."

Later, returning to the subject of the purchase of Cashflow, Caro told Obispo that Obispo would continue delivering checks to Caro. La Bamba would continue preparing the CTRs under the names of the fictitious companies. But in the event of an audit, Obispo would be responsible for any documentation Caro might need.

During another conversation, Caro and Obispo discussed how La Bamba prepared their CTRs. According to Caro, Chaoui had full responsibility for the CTRs. Elaine Becerra, the person at La Bamba responsible for preparing all the CTRs, may prepare them, but she was supervised by both Caro and Chaoui. Obispo retorted that Caro did not know much about preparing and filing CTRs because Becerra and Chaoui handled them. In response, Caro explained that he had done the job before Chaoui's arrival, and while Chaoui knew about banks

24

"from the inside," Caro knew more "about banks."

### 5. La Bamba's Internal Operations

La Bamba was situated in a two-story building with a customer waiting area, a teller window area, and four offices. Caro's office was downstairs, while Elaine Becerra and Chaoui's offices were upstairs.

La Bamba had branch offices, but they were not authorized to cash checks in large amounts. If someone presented a large check in one of those locations, the cashier was required to call the main office for approval from Caro, Chaoui, or Gonzalez. The same procedures applied when someone other than the registered representative sought to cash a check at a branch store or a mobile van. No CTRs were prepared at the branch stores or the mobile vans, even if they engaged in transactions over $10,000. In such a case, the information was sent to La Bamba's main office where the CTR was prepared.

Before cashing checks, La Bamba's tellers or cashiers verified that the check was "okay" and that the person who was cashing the check was the proper person to cash the check. This was verified consulting La Bamba's database, which contained the application that a company's owner completed when first registering with La Bamba. If anyone other than an authorized person wished to cash a check, a supervisor, such as Caro or Gonzalez, was required to approve the transaction.

Regardless of the where the transaction occurred, from 2004-2008, Elaine

Becerra prepared all of La Bamba's CTRs. An immigrant from Cuba, Becerra had no background in finance or banking. But after receiving training from Teresita Caro, Caro's sister, on filling out the CTRs, they were Becerra's responsibility.

Becerra was not solely responsible for the CTRs, however. Once they were completed, Becerra submitted them to Chaoui for his approval and signature. Chaoui also served as a resource if she had any questions about her work.

Becerra was never able to observe the actual cashing of checks from her workstation. Instead she relied upon computer programs to assist her in the preparation of the CTRs. When Becerra began working at La Bamba, in 2004, she used a computer system, named Ideal, to create a database to record La Bamba's customers. In 2005, Ideal was replaced by Power Check, and in 2006 Archive was added. Becerra used these tools simultaneously to retrieve the data that she needed to fill out a CTR. The databases contained a company's ID number, its address, and the name of the person that cashed the check. Becerra trusted that if the check was payable to a person or company, that was the person or company that actually cashed the check.

Becerra also relied upon certain pieces of information from the check itself to prepare the CTRs. The Archive computer program scanned the checks and placed them into the system. She relied upon the amount from the check, the date, and the name of the person who cashed the check. Becerra used the name of the

26

person or the company listed as the payee on the check to prepare a CTR, unless she was instructed otherwise.

In gathering the information for the CTRs, Becerra also created her own alphabetical list of check-payees for each day. With this list, Becerra created a master list of the daily transactions. After she calculated the sum of the day's transactions for each payee, Becerra determined whether the aggregate daily transactions exceeded $10,000, which triggered the reporting requirement.

Becerra prepared the CTRs on a weekly basis and submitted them to Chaoui. Once signed, Becerra mailed them to the IRS. During her years at La Bamba, no one ever told Becerra that she was not performing her job correctly.

The flaw in Becerra's whole procedure was that she "trusted that the person who was actually cashing the check [was] the person registered with Power Check." Consequently, the CTRs prepared by Becerra, approved by Chaoui, and filed by La Bamba stated that particular individuals had cashed checks at La Bamba on certain dates, although Becerra was unable to ascertain whether those individuals had actually done so.

For example, Becerra's log for June 29, 2006, reflected that Fast cashed checks amounting to $156,755. The CTR filed by La Bamba stated that the transaction was conducted by Jose Montenegro, Fast's corporate officer, but Becerra had not seen Montenegro nor could she verify whether he actually cashed

those checks.

Similarly, Becerra's log for December 6, 2006, reflected that checks amounting to $102,992 had been cashed for Spirit. The CTR filed by La Bamba stated that Marroquin, Spirit's corporate officer, had conducted the transaction, although Becerra did not know whether Marroquin had been at La Bamba to cash those checks. She simply assumed it was him.

During her employment with La Bamba, Becerra participated in training meetings held twice yearly, which were run by Chaoui and Gonzalez. During those meetings it was discussed how important it was to obtain the proper information from people cashing checks to make Becerra's job easier. Furthermore, Becerra took periodic tests to ensure she understood CTR preparation.

### 6. Oscar Valle

Delvin Ortega[16] was employed by Oscar Valle. Ortega explained to the jury his experience in Valle's scheme. Oscar Valle created various shell companies, including Trebol Construction ("Trebol"), Huber Construction ("Huber"), Mira Construction ("Mira"), DJ, and SNF Construction ("SNF"), for the purpose of obtaining workers' compensation insurance policies and permitting other companies to perform work under the insurance policies for Valle's companies.

---

[16] Ortega is also known as Tomas Garcia

28

Contractor employers wrote checks to Valle's companies to pay their workers, and these checks were cashed at La Bamba for a fee.

Like the other shell companies, Valle's companies did not perform any construction work and Valle's friends and relatives functioned as their corporate officers.[17] As with the other shell companies, the addresses listed in state records for Valle created companies were residential addresses that gave no indication that construction business was transacted there.

Valle's commissions were placed in an envelope for him at La Bamba. It was Ortega's responsibility to pick up the commissions for Huber and Mira. From November 2006 until March 2007, Ortega waited at La Bamba, usually on Fridays and sometimes on Saturdays, to pick up the envelopes containing Valle's 4% commissions. These commissions ranged from $13,000 to $16,000 weekly, but Ortega recalled the largest was $23,000. Ortega received these commissions from either a female employee, Caro or Gonzalez.

La Bamba filed CTRs for transactions totaling $60,949,702 for Valle's five shell companies. From March until November 2007, La Bamba filed 157 CTRs for DJ transactions totaling $14.5 million. From September 2006 until November

---

[17] The corporate representative for Trebol was Oscar Valle's father; the corporate representative for Huber was Valle's mother Flora; the corporate representative for Mira was Miguel Ramirez, Valle's friend; the corporate representative for DJ was Valle's aunt Gladys; and the corporate representative for SNF was Francisco Ortega, another of Valle's friends.

2007, La Bamba filed 243 CTRs for Huber transactions totaling $16 million. From May 2006 to November 2007, La Bamba filed 211 CTRs for Mira transactions totaling $18.9 million. From October to November 2007, La Bamba filed 13 CTRs for SNF transactions totaling $557,000. From August 2005 until November 2007, La Bamba filed 193 CTRs for Trebol transactions totaling $10.7 million.

In July 2007, Obispo confided to Caro that Spirit would be dissolving because its insurance was expiring and it had no useful life without insurance. Obispo asked Caro for a company where he could place some clients. Caro gave Obispo a DJ business card, and told him to contact "Oscar" or "Tomas."

In response to Obispo's telephone call to DJ, Valle and Ortega met Obispo at Cashflow. Valle explained he had spoken with Caro, and that he had three companies with workers' compensation insurance to offer Obispo. Obispo was told he could write approximately $100,000 in checks to DJ weekly for a 3% commission. The checks would be cashed at La Bamba, and Valle and La Bamba would be responsible for preparing and filing the CTRs. They, further, agreed that the CTRs would falsely list DJ's corporate officer, Gladys Valle, as receiving the cash from the check, instead of the person who actually received it. Valle assured Obispo that he had been working with Caro for four years and had never encountered a problem.

Valle gave Obispo the necessary paperwork for DJ, including a copy of the

articles of incorporation, a copy of Gladys Valle's driver's license and social security number, and a certificate of workers' compensation insurance. It was agreed that DJ's corporate officer would not be present when the checks were cashed and that her signature would be forged.

Obispo delivered checks to La Bamba made payable to DJ Construction. Caro deducted a 5% commission for Obispo's checks written to DJ; 3% for Valle and 2% for La Bamba.

From August until October 2007, Obispo brought checks to La Bamba made payable to DJ from undercover IRS companies. Notably, in these transactions the checks were left unendorsed. On one occasion, Caro asked Obispo to make the amounts of the checks smaller. On another occasion, Caro reminded Obispo to write his name on the back of the checks and to mark the checks with the initials "M.H." as was their custom.

### 7. Rodrigo Donadio

Caro and La Bamba cashed checks for more clients than simply Obispo and Cashflow. One of those clients, Rodrigo Donadio, a subcontractor who owned the companies, "Second to None" and "Bencomo Artemisa."

Donadio had a pre-existing business relationship with Alfredo Ortega. Ortega approached Donadio and asked how he was paying his workers, some of whom were illegal aliens. Ortega explained a company was available that would

allow Donadio to write checks that could be used to pay his workers in cash. Other companies were doing the same thing, according to Ortega.

After two weeks, Donadio asked Ortega about more details. Ortega explained the scheme, including how Donadio's workers would be covered by workers' compensation insurance. Donadio agreed and Ortega gave him the name of DNC to write checks to. After another few weeks, Ortega directed Donadio to write checks to Fast instead of DNC. Later, Donadio was directed to write checks to Spirit. Regardless of to whom the checks were written, Donadio payed a 5% to 6% commission per check, and those checks were cashed at Cashflow. Donadio testified that he knew the scheme was illegal, but he explained that the benefit of using the shell companies was that he no longer had to pay payroll taxes or be concerned with workers' compensation insurance.

After some time, Donadio contacted Caro and asked if Caro could provide a similar service, but at a reduced rate. Caro was willing to provide the identical service for a 3.5% to 4% per check fee.

In early 2007, Caro gave Donadio the name Mira to write checks to. Caro instructed Donadio to contact La Bamba for a copy of Mira's insurance certificate.

Donadio wrote checks from Second to None to Mira in amounts ranging from $10,000 to $80,000 every Thursday and sent them by facsimile to La Bamba. Normally, several hours later Chaoui personally delivered the cash to Donadio.

However, on the few occasions when Donadio went to La Bamba to have his checks cashed, this was done directly by Caro.

Specifically, Donadio testified about an April 4, 2007, check in the amount of $29,204. Donadio explained that he signed the check to Mira and delivered it to Chaoui. But Donadio could not explain the endorsement on the back of the check. It was not his, nor did he know whose it was.

Donadio also began writing checks from his other company, Bencomo Artesima, to Mira and cashing those checks at La Bamba. After seven to nine months, Donadio was told by Chaoui to write his checks to another company, DJ. Donadio again received an insurance certificate from La Bamba for DJ.

In March 2008, Donadio was approached by law enforcement officers. Donadio cooperated in the investigation and obtained immunity for his statements and was not charged in the conspiracy.

### 8. Adelino Agostinho

Caro also gave Contractor Adelino Agostinho, owner of Silva Builders, the name of DJ to use to pay Silva's payroll. Previously, Agostinho had employed a similar system with subcontractors who had used the insurance certificates for Valle's shell companies, Trebol, Mira, Huber, and SNF. Those checks had been cashed at La Bamba for a 6% commission.

Eventually, because the illegal aliens he employed had no taxpayer

identification numbers, Agostinho arranged with Caro to pay those workers by writing checks to DJ that La Bamba would cash. Once he wrote a check to DJ, Agostinho segregated the payment for those workers from the remainder of his workforce and submitted, by facsimile transmission, an invoice under DJ Construction's name for the total amount of the check that he needed to pay those workers, in addition to a 5% commission. Agostinho had an employee prepare the DJ invoice so that it would appear to be legitimate in the event that it ever came under scrutiny from the government.

The check was delivered to La Bamba, along with envelopes marked with each worker's name and amount that he was to receive. La Bamba cashed the check from Silva Builders to DJ and filled each envelope with the appropriate amount of cash for the workers to pick up at La Bamba on Friday afternoons.

In January 2008, Agostinho wrote three checks to DJ. These checks were for different subcontractors who did work for Silva. Over a six-month period, Agostinho wrote checks from Silva Builders to DJ for $2,687,668.44. Agostinho was unaware whether La Bamba filed CTRs for those transactions.

### 9. Andres Martinez

Andres Martinez owned Design Builders. He and Mario Edgardo Varela Rivera, who was in charge of personnel and payroll for Design Builders, met Caro in February 2006. Rivera testified that Caro recommended that Design Builders use

Mira to pay its workers and avoid payroll taxes and workers' compensation insurance premiums.

Originally, La Bamba cashed checks for Design Builders' employees every Friday because most of its workers were illegal aliens. La Bamba loaned the payroll money to Design Builders and permitted the money to be repaid one week later. La Bamba charged Design Builders a commission of 2% for employees' checks and 3% for its cash advances.

This continued until May 2006, when Caro suggested that Design Builders simply make the checks payable to Mira. Caro explained to Rivera that Design Builders would avoid payroll taxes, and workers' compensation premiums by making checks payable to Mira.

Eventually, Martinez, Rivera and Valle met at La Bamba, and Valle offered Mira's services for a 6% check fee. Valle subsequently provided Design Builders with a copy of Mira's insurance certificate. Design Builders wrote its first check to Mira in May 2006, and for six or seven months thereafter. Design Builders wrote checks to Mira until Valle instructed Rivera to make the checks payable to Huber, Valle's new company. Design Builders' checks to Huber were cashed at La Bamba for the same 6% commission.

The Huber arrangement continued for another seven or eight months until it was replaced with DJ, yet another one of Valle's companies. Design Builders' first

check to DJ was written in March 2007.

Design Builders wrote checks for $575,188.20 to Huber; for $1,071,258.93 to Mira; and for $1,340,180.56 to DJ. No one at Design Builders ever worked for Huber, Mira, or DJ. Design Builders never endorsed the checks made payable to Valle's companies.

### 10. Joseph Dieppa

Contractor Joseph Dieppa was the owner of Advanced Surface Restoration, Inc. ("Advanced"). Dieppa obtained from Caro the names of shell companies to write checks to so that he could pay his workers in cash, and avoid payroll taxes and workers' compensation insurance premiums.

In 2005, Dieppa's company obtained a $60 million contract to construct a condominium building on Fisher Island, a small island off Miami Beach. When Dieppa encountered difficulties in retaining subcontractors, he contacted Caro, who had a reputation for having a connection to subcontractors.

Dieppa's labor shortfall continued prompting him to assemble his own team of workers and to obtain from Caro the name of Morgan Construction ("Morgan") to write checks to in order to allow the payment of wages to those workers. By writing checks to Morgan, Dieppa was able to pay his workers cash and avoid payroll taxes. Dieppa also avoided the expense of premiums for workers' compensation insurance because his workers used Morgan's insurance certificate.

36

Still another benefit of Caro's service, Dieppa hired illegal aliens who could be paid with cash.

Caro charged Dieppa a 10% fee per check and gave him copies of Morgan's articles of incorporation and certificate of insurance. Every two weeks, Dieppa wrote a check to Morgan for the workers' salaries, adding a 10% commission for Caro. After receiving the amount from Dieppa, Caro personally delivered the cash to Dieppa, at his Fisher Island office. Caro also brought Dieppa invoices on Morgan letterhead. The money Caro delivered to Dieppa was packaged in manila envelopes and boxes. When Caro was not available to bring the cash to Dieppa, Caro's sister or Chaoui came in his place.

In 2006, Deippa assembled his own laborers for another project. Again he used Caro's services. This time, Caro gave him the name of Mira to write payroll checks to. The Mira scheme operated in the same manner as with Morgan. Caro furnished a copy of Mira's insurance certificate and delivered Mira invoices to Dieppa, along with cash.

In addition to Morgan and Mira, Dieppa wrote his payroll checks to the following shell companies provided by Caro: Huber; SAS; Trebol; GQ; Petrillo Construction; and Aly Trucking.

Caro also provided Deippa with false lien releases from the shell payee companies to whom Deippa had written checks. A lien release indicates that a

contractor has been paid; the contractor releases the invoice. Without this signed release, a subcontractor cannot be paid. Caro gave Dieppa releases from the owners of Huber, Mira, and SNF. Dieppa's business with Caro ended only when Caro was arrested in January of 2008. By that time, Dieppa had written a total of $3.9 million in checks to Caro provided companies.

### 11. Nevin Shapiro

Caro always sought opportunities to expand his client base. In early 2007, when Caro met Nevin Kerry Shapiro at a Miami Heat basketball game, he offered Shapiro a loan of $7,000 cash with no terms. Shapiro testified that Caro who had the cash on his person, gave the money to Shapiro with only a handshake to seal their agreement. Shapiro was to repay the money with a $500 fee. Shapiro repaid the loan by writing a check for $7,523.23 from his real estate company to Huber, at Caro's direction.

Shapiro then borrowed $50,000 from Caro in October 2007 and repaid the loan by writing a personal check for $52,500 to DNC. The $2,500 represented interest on the loan and Shapiro did not endorse the check before personally delivering it to Caro.

The loans from Caro and repayments from Shapiro continued for five more transactions. Caro sent someone to Shapiro's office to pick up Shapiro's check or Shapiro gave the check to Caro personally at a Heat game or by visiting La Bamba.

38

To repay the loans, Shapiro wrote checks to AFC Painting and Huber, entities who had never performed any work for him, and finally, to La Bamba. Although Caro insisted that the other companies Shapiro had written the checks to were "his," Shapiro was uncertain about the others. Caro agreed reluctantly to permit Shapiro to write the final two checks, one for $50,000 and one for $52,000, directly to La Bamba.

### 12. Caro and his bank

Caro frequently complained about scrutiny from his bank. Madeline Jenkins, Peninsula Bank's senior compliance officer, testified Caro's complaints were well founded because Peninsula Bank was constantly reviewing La Bamba's BSA compliance.

Jenkins explained that money service businesses, like La Bamba, are one of the highest-risk accounts for a bank. Therefore, the bank monitors those accounts more than the average. Jenkins explained that what made those accounts so risky is a money service business ("MSB") is responsible for its own due diligence on its customers before processing a check, to maintain its business license. Jenkins explained this as "Know Your Customer;" or knowing who they are an who they claim to be. If the MSB is not conscientious in knowing its customer, however, the bank can be placed at risk. This risk to the bank could result in closure or bank members being prosecuted.

When Peninsula established accounts for La Bamba in 2004, it imposed the conditions that separate accounts be maintained for depositing checks to individuals and corporations. Peninsula also required La Bamba to maintain a certificate of deposit on account as collateral for the other accounts.

Initially Peninsula limited La Bamba to a maximum of $30,000 an item and $100,000 a company per day. This limitation was meant to prevent fraud. Caro approached Peninsula about increasing these limits. Peninsula, agreed to the increase provided that Caro establish a savings account and deposit $1 million to be used as collateral when he wanted to draw against uncollected funds. This arrangement worked for a few months until Caro requested cash in amounts that exceeded the balances in all La Bamba accounts. Caro also requested to withdraw cash from the $1 million savings account to fulfill his orders.

Jenkins wrote Caro seeking an explanation of the changes in La Bamba that necessitated this amount of cash. According to Caro, La Bamba serviced customers on the weekends, La Bamba's mobile units were increasingly being used, and La Bamba had six offices in South Florida. Interestingly, Caro failed to mention La Bamba's relationship with Cashflow or its increased business with construction companies.

After an internal review of its policies, Peninsula began transactional testing. Jenkins testified the bank began looking at the items La Bamba was

actually depositing and the pattern of dollars to individuals or corporations. Based on this initiative, Peninsula discovered La Bamba permitted some corporations to use a stamp to endorse checks, and that La Bamba's exceeded the limits that had been imposed on deposits.

Peninsula attempted to have a special software program installed at La Bamba. This program, for all Peninsula's MSB clients, looked for patterns in activity. Only after being assured that Peninsula would not be able to remove data from the system, was La Bamba willing to accept the software. Interestingly, when Peninsula received the software's data from La Bamba, it only included information from La Bamba's branch stores not the main office. Jenkins questioned Caro about this, and he responded another software system existed at the main store. However, that was never shared with Peninsula.

In an e-mail, dated May 30, 2007, Chaoui provided Peninsula with a list of La Bamba's mobile units and La Bamba's quarterly report. This quarterly report provided the number of checks cashed for the preceding three months, the fees received from cashing checks, and the fees from other services. Absent from this report was any reference to the millions of dollars in transactions it had monthly with Cashflow.

Still wanting to strengthen its policies to MSBs, Peninsula retained an attorney to create an agreement for Peninsula's MSBs to sign and return. Jenkins

testified that this agreement required MSBs to: guarantee to the bank that they were fulfilling their responsibilities for their licenses; provide information on their transactions and corporate structure; and warranty use of its collateral. La Bamba failed to return a signed copy of the form.

Later, Jenkins sought information on the identities of some of the companies listed in La Bamba's transactions. Chaoui replied that La Bamba had acquired two vendors under La Bamba's license, but Cashflow was again absent from this list.

Finally, at the end of October 2007, Peninsula conducted an on-site audit of La Bamba to assess its BSA compliance. This audit concluded that La Bamba needed improvement. A deficiency that was found, according to Jenkins, was La Bamba's apparent carelessness in filing its CTRs. Although the CTRs were timely filed, about 10% of them, or 300 out of 3,250, were returned "because of errors or legibility problems." The audit recommended that the CTR personnel receive additional training. Moreover, the audit noted that La Bamba was overdue for its annual BSA training. The auditors, further, found La Bamba's due diligence deficient and recommended that its compliance officer and its staff receive more training. The results of the audit were shared with Caro and La Bamba.

### 13. Government Agents

IRS Agent Rondon testified about his involvement in the investigation into La Bamba, and detailed PAW checks that the IRS provided to Obispo, who in turn

delivered them to La Bamba. Rondon specifically testified regarding the circumstances surrounding Counts Eight through Seventeen. Rondon detailed how the IRS provided Obispo these checks, how Obispo took them to La Bamba, and how La Bamba filed false CTRs for those transactions.

Rondon testified that he reviewed approximately 1,500 CTRs filed by La Bamba in connection with this investigation. None of these CTRs were accurate, according to Rondon, because they reported transactions involving shell companies that were not engaged in construction.

IRS Agent Vincent Lozowicki explained that Peninsula provided the IRS with monthly statements from La Bamba's bank accounts. A review of those accounts revealed that in 2006 and 2007, La Bamba deposited a total of over $600 million in checks each year for all sources. Over $400 million of that total were from checks made payable to corporations and business entities. The remaining $200 million were made payable to individuals. La Bamba averaged $50 to $60 million a month in check deposits in 2006 and 2007.

Lozowicki, further, explained that he reviewed some of the checks that La Bamba had deposited for the shell corporations listed in the superseding indictment. He observed that some of these checks had a stamped endorsement, and he described this as unusual.

Isabel Fleitas, a senior investigative analyst with the IRS, was able to locate

all the CTRs filed by La Bamba for the shell companies named in the superseding indictment. From August 2005 to January 18, 2008, La Bamba filed 1,559 CTRs reflecting a total of $132,773,648.47 in transactions from only shell corporations. Fleitas also explained that she determined that all of the companies who filed CTRs filed them for more than $100,000 in a twelve month period.

### 14. Termination of Conspiracy

On January 18, 2008, agents executed a search warrant at La Bamba's headquarters and its warehouse. On the same day, agents arrested Caro, Chaoui, and Gonzalez.

Among the items found in the La Bamba store were client files containing forms and copies of driver's licenses and articles of incorporation for companies, including the documents for PAW and other fictitious companies; training manuals on BSA compliance and forms showing that such training had been conducted at La Bamba; boxes of business cards for DJ and SNF; and envelopes for commissions for the recruiters of the shell companies, including one with Valle's name on it.

While out on bond following his arraignment, Caro met contractor Dieppa at the Beach Club on Fisher Island. Caro asked Dieppa to "remove" the subcontractors' releases from his files. Dieppa interpreted this remark to mean, "make them disappear." In addition, Caro urged Dieppa to tell the investigators

that the work had been performed.

Based on this and other evidence, the jury found Caro guilty of Counts One, Two, Six, and Eight through Seventeen. La Bamba was convicted of Counts One, Eighteen, Nineteen, and Twenty-Two through Thirty-Three. The District Court declared a mistrial as to Gonzalez and Chaoui. Both Chaoui and Gonzalez subsequently pled guilty to corruptly endeavoring to obstruct and impede administration of internal revenue laws, in violation of 26 U.S.C. § 7212(a), and received three-year custodial sentences.

## IV. STANDARDS OF REVIEW

More than one standard of review guides the analysis of this appeal. We review *de novo* the following issues: the sufficiency of evidence, United States v. Taylor, 480 F.3d 1025, 1026 (11th Cir. 2007); allegations of prosecutorial misconduct, United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006); a possible double jeopardy violation, United States v. Thurston, 362 F.3d 1319, 1322 (11th Cir. 2004); and the correctness of jury instructions, United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000).

An abuse of discretion standard applies when we review: evidentiary rulings, United States v. Novaton, 271 F.3d 968, 1005 (11th Cir. 2001); the failure to give a requested jury instruction, United States v. Yeager, 331 F.3d 1216, 1222

(11th Cir. 2003); the denial of a motion for mistrial, <u>United States v. Emmanuel</u>, 565 F.3d 1324, 1334 (11th Cir. 2009); the denial of a severance motion, <u>United States v. Watchmaker</u>, 761 F.2d 1459, 1476 (11th Cir. 1985); and a defendant's sentence, <u>United States v. Bonilla</u>, 579 F.3d 1233, 1239 (11th Cir. 2009).

## V.  TRIAL ISSUES

### A.  Sufficiency of Evidence

Caro maintains the evidence at trial was insufficient to convict him of the CTR offenses.[18]  It is Caro's contention that the government's evidence adduced at trial failed to establish the requisite *mens rea* to convict him of knowingly causing false CTRs to be filed.

Caro was found guilty of Counts One, Two, Six, and Eight through Seventeen of the Superseding Indictment, violations of 18 U.S.C. § 2,[19] 371;[20] 31

---

[18]  In a joint brief, Caro and La Bamba indicate that all appellate arguments therein also apply to La Bamba.  (Blue Brief at 2 & n. 1).

[19]  18 U.S.C. § 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[20]  18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the

U.S.C. § 5313(a);[21] § 5324(a)(2),[22] (d)(2).[23]

---

conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

[21] 31 U.S.C. § 5313(a) provides:

When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

[22] 31 U.S.C. § 5324(a) provides:

(a) Domestic coin and currency transactions involving financial institutions.--No person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, the reporting or recordkeeping requirements imposed by any order issued under section 5326, or the recordkeeping requirements imposed by any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508–

***

(2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) or 5325 or any regulation prescribed under any such section, to file a report or to maintain a record required by any order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508, that contains a material omission or misstatement of fact;

[23] 31 U.S.C. § 5313(d)(2) provides:

Whoever violates this section while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) or (c)(3) (as the case may be) of section 3571 of title 18, United States Code, imprisoned for not more than 10 years, or both.

We review *de novo* the sufficiency of evidence. Taylor, 480 F.3d at 1026. In reviewing such a challenge, we view the "'evidence in the light most favorable to the Government, drawing all reasonable inferences and credibility choices in the Government's favor.'" United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011)(quoting United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007)). The jury's verdict "cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991).

"'The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" United States v. Schmitz, 634 F.3d 1247, 1259 (11th Cir. 2011) (quoting United States v. Robertson, 493 F.3d 1322, 1329 (11th Cir. 2007)). A jury "is free to draw between reasonable interpretations of the evidence presented at trial." United States v. Flores, 572 F.3d 1254 (11th Cir. 2009). "Credibility determinations are left to the jury and the jury's verdict will not be disturbed on appeal unless the testimony is 'incredible as a matter of law.'" Id. (quoting United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997)).

"The [BSA] and its accompanying regulations require banks and other

financial institutions to file a report with the government for any cash transactions involving more than $10,000." United States v. Vazquez, 53 F.3d 1216, 1218 (11th Cir. 1995); 31 U.S.C.A. § 5313(a); 31 C.F.R. § 103.22(b)(1) (2000). To comply with the requirements, check-cashing stores, like La Bamba, must file a CTR detailing these transactions with the IRS. 31 U.S.C. § 5313; 31 C.F.R. § 103.22 (2009).

It is illegal, according to § 5324(a)(2), for any person to "cause or attempt to cause" a financial institution to file a report "that contains a material omission or misstatement of fact." "This anti-structuring law aims to prevent people from either causing a bank to fail to file a required report or defeating the government's efforts to identify large cash transactions by splitting up a cash hoard in a manner that avoids triggering a bank's reporting requirements." Vazquez, 53 F.3d at 1218 (quotation and citation omitted).[24]

At trial, the District Court instructed the jury concerning what the evidence

---

[24] The Supreme Court, in Ratzlaf v. United States, 510 U.S. 135, 114 S. Ct. 655, 126 L. Ed. 2d 615 (1994), determined that the language of § 5324 on its own was not clear as to the requisite level of knowledge required to violate the statute, therefore § 5322(a) also needed to be consulted. The Court required that the government demonstrate proof of knowledge of illegality before a defendant could be convicted. 510 U.S. at 137.

However, since Ratzlaf, Congress amended § 5324, and gave it "its own criminal penalty provision so reliance on § 5322 is no longer necessary." Vazquez, 53 F.3d at 1218 n. 2. "Thus, the only mental state apparently required under the new penalty provision is a purpose to evade the filing requirement." Id.; see United States v. Zehrbach, 47 F.3d 1252, 1262 n.7 (3rd Cir. 1995) (stating "the only mental state that the Government must prove in prosecutions for structuring is the purpose of having a financial institution not file a required report.")

must have demonstrated, beyond a reasonable doubt, to convict Caro and the other co-conspirators in Count One.

> What the evidence in the case must show beyond a reasonable doubt is:
> First, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment;
> Second, that the Defendant, knowing the unlawful purpose of the plan, willfully joined in it;
> Third, that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the methods or overt acts described in the indictment;
> And, fourth, that such overt act was knowingly committed at or about the time alleged in an effort to carry out or accomplish some object of the conspiracy.
> An overt act is any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspiracy.
> A person may become a member of a conspiracy without knowing all of the details of the unlawful scheme and without knowing who all of the other members are.
> So if a defendant has a general understanding of the unlawful purpose of the plan and knowingly and willfully joins in that plan on one occasion, that is sufficient to convict that Defendant for conspiracy, even though the Defendant did not participate before and even though the Defendant played only a minor part.

(Dkt. 528, pgs 63-64). As to Counts Two through Seventeen the District Court instructs the jury:

> So the Defendants can be found guilty of the counts for which they have been individually charged in Counts 2 through 17 of the superseding indictment only if all of the following facts are proved beyond a reasonable doubt with respect to each count:
> First, that the Defendant had knowledge of the currency

50

transaction reporting requirements;

Second, that, with such knowledge, the Defendant knowingly caused or attempted to cause a domestic financial institution to file a currency transaction report that continued[25] a material omission or a misstatement of fact;

And, third, that the purpose of the false report was to evade the transaction reporting requirements.

A statement is false when made if it is untrue and is then known to be untrue by the person making it. It is not necessary to show, however, that the Government agency was, in fact, deceived or misled.

A material omission or a misstatement of fact is material if it has natural tendency to affect or influence or is capable of affecting or influencing the exercise of a Government function.

The test is whether the material omission or misstatement of fact has the capacity to impair or pervert the functioning of a governmental agency.

In other words, a material omission or a misstatement of fact is material if it relates to an important fact as distinguished from some unimportant or trivial detail.

*Id.* at 65-67. The District Court also gave the following instruction for Counts

Two through Seventeen.

So, in this case, with regard to Counts 2 through 17 of the superseding indictment and insofar as the Defendants, Juan Rene Caro, Alfredo Gonzalez and Jose Chaoui, are concerned, respectively, if you have first found any of those Defendants guilty of the conspiracy offense as charged in Count 1 of the superseding indictment, you may also find that specific Defendant guilty of any of the offenses charged in Counts 2 through 17, even though such Defendant did not personally participate in such offense, if you find beyond a reasonable doubt:

First, that the offense charged in such count was committed by a conspirator during the existence of the conspiracy and in furtherance

---

[25] The written instructions provided to the jury state "contained," not "continued." (Dkt. 397, pg. 17).

of its objects;

Second, that the Defendant under consideration was a knowing and willful member of the conspiracy at the time of the commission of such offense;

And, third, that the commission of such offense by a co-conspirator was a reasonably foreseeable consequence of the conspiracy.

*Id.* at 69.

As for Counts Eighteen through Thirty-Three, the District Court instructed the jury in the following manner:

The same is true with regard to Counts 18 through 33 of the superseding indictment insofar as Defendant Maytemar Corporation, doing business as La Bamba Check Cashing, is concerned.

So La Bamba Check Cashing can be found guilty of Counts 18 through 33 only if all of the following facts are proved beyond a reasonable doubt with respect to each count:

First, that La Bamba Check Cashing had knowledge of the currency transaction reporting requirements;

Second, that, with such knowledge, La Bamba Check Cashing willfully filed a currency transaction report that contains a material omission or a misstatement of fact;

And, third, that the purpose of the false report was to evade the transaction reporting requirements.

A statement is false when made if it is untrue and is then known to be untrue by the person making it. It is not necessary to show, however, that the Government agency was, in fact, deceived or misled.

A material omission or a misstatement of fact is material if it has a natural tendency to affect or influence or is capable of affecting or influencing the exercise of a government function.

The test is whether the material omission or misstatement of fact has the capacity to impair or pervert the functioning of a governmental agency.

In other words, a material omission or a misstatement of fact is material if it relates to an important fact as distinguished from some

unimportant or trivial detail.

*Id.* at 67-68.[26]

Caro maintains that La Bamba's CTRs for Obispo were proper and contained no omissions or misstatements in violation of the BSA because Obispo acted as La Bamba's agent. As for the remaining CTRs, Caro asserts that the evidence failed to prove that he knew of the falsity of the CTRs.[27]

We reject Caro's assertions, and conclude there was sufficient evidence for his convictions. The government introduced evidence that Valle, a co-conspirator and co-defendant, set up a number of shell companies through which he filed false CTRs with La Bamba. There was also testimony that Caro referred individuals to Valle to take advantage of his shell companies.

Other witnesses, including Dieppa and Agostinho, testified they used La Bamba to cash checks through shell companies to avoid taxes. Marroquin, the President of Spirit, testified that he never entered La Bamba, yet La Bamba filed CTRs for millions of dollars that reported him as conducting the transactions.

Caro was far from an inactive participant in this scheme. In fact, testimony

---

[26] Caro make no independent argument that these instructions incorrectly characterized the elements of the offenses for which he was convicted.

[27] Caro makes no claim that there was insufficient evidence for the jury to determine he was not "violating another law" or took part in "a pattern of any illegal activity involving more than $100,000 in a 12-month period," as required by 31 U.S.C. § 5313(d)(2).

was presented that Caro promoted the scheme. Donadio testified he received the name of the shell company, Mira, directly from Caro, and Caro specifically instructed him to fax copies of checks payable to shell companies directly to La Bamba, and that cash was then delivered to Donadio by Chaoui. Agostinho and Rivera explained Caro instructed them to write checks to shell companies to avoid paying taxes. Rivera testified to the same activity and identified Caro as one of the individuals that cashed the checks. Dieppa testified that he agreed with Caro to write checks to shell companies for a fee. Dieppa also testified that Caro prepared and provided to him false invoices for shell companies to circumvent bank scrutiny, and that Caro instructed Dieppa to switch from one shell company to another.

In addition, the jury viewed undercover video footage of Caro engaged in a variety of activities. For example, video footage captured Caro structuring deposits to avoid bank detection, openly discussing with the confidential informant whether companies that were cashing checks were fictitious, acknowledging that the companies that were cashing checks were fictitious, and making comments suggesting that he was seeking to evade law enforcement.

Furthermore, the jury had to look no further than to Caro's own admission that he knew of the illicit nature of the fictitious companies whose checks he accepted from Obispo. Caro told Obispo he could not rely upon the

"miquimbines," because they were not reliable.

Additionally, the jury could consider the material discovered at La Bamba. Among the items found in La Bamba were client files containing forms and copies of driver's licenses and articles of incorporation for companies, including the documents for PAW and other fictitious companies; training manuals on BSA compliance and forms showing that such training had been conducted at La Bamba; boxes of business cards for DJ and SNF; and envelopes for commissions for recruiters, including one for Valle.

It was possible for the jury to view Caro's lack of oversight of Becerra, in her preparation of the CTRs, as his attempt to shield himself from an appearance of impropriety as to La Bamba's actions. Becerra was trained on the procedure for filling out CTRs by Caro's sister. Becerra was also sequestered away from customers who were actually cashing checks. The jury could reasonably infer this was done so Becerra could not correctly identify those taking part in the transactions at La Bamba. While Chaoui was Becerra's supervisor and signed all of La Bamba's CTRs, Caro's statement to Obispo that he had done the job before Chaoui's arrival and knew more "about banks" than Chaoui contradicted this contention.

Finally, Caro cannot avoid conviction by arguing someone else committed the illegal acts rather than him. Regardless of whether Obispo acted as his agent,

55

the CTRs filed for these transactions by La Bamba contained material misstatements for which Caro can be found guilty as an aider and abetter under 18 U.S.C. § 2, for causing someone to commit a criminal act on his behalf.  Sufficient evidence was adduced at trial that Caro actively participated in the filing, or causing to be filed, false CTRs.

Contrary to Caro's assertions, the evidence was more than sufficient to allow a reasonable trier of fact to find that Caro purposely evaded the CTR filing requirements by causing La Bamba to omit material information and causing La Bamba to willfully file CTRs knowing that they contained material omissions or misstatements of fact.

## B.  Infringement of Fifth and Sixth Amendment Rights

Caro contends the District Court erred in allowing certain evidence and testimony at trial.  The cumulative effect of all these errors, according to Caro, resulted in him receiving an unfair trial.

### 1.  Expert Testimony

Caro argues that the District Court impermissibly allowed government expert witness Djinis to testify regarding a MSB and the BSA obligations.  Caro filed a Motion in Limine directed at this testimony and objected to it during trial.  After listening to the argument of counsel, the District Court allowed the testimony to be admitted explaining that Fed. R. Evid. 704 permitted an expert witness to

testify about an ultimate issue in the case, but not that an action was intentional. This testimony failed, according to Caro, to take into account the actual business practices of check-cashers and led the jury to believe they had a higher burden of compliance with the BSA than the law imposed.

We review rulings on the admissibility of expert testimony for abuse of discretion. Allison v. McGhan Medical Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)(citing General Elec. Co. v. Joiner, 522 U.S. 136, 142-43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). "This deferential standard is not relaxed even though a ruling on the admissibility of expert evidence may be outcome-determinative." Id. An expert may offer opinion testimony on an ultimate issue of fact, Fed. R. Evid. 704, although "[a]n expert may not, however, merely tell the jury what result to reach." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990).

There was no abuse of discretion in allowing this testimony. Djinis was the former deputy director of FinCEN, the agency that collects CTRs, compiles them for law enforcement, and provides advice to companies on how to comply with the BSA requirements. Djinis testified as to the content and purposes of the BSA, and the CTR obligations of domestic financial institutions. This was not, as Caro suggests, a witness inappropriately instructing the jury on the law applicable to the case.

57

Furthermore, the District Court specifically instructed the jury that they had heard testimony from experts, including Djinis, and that simply because a witness has given an opinion, the jury was not bound to accept that opinion. (Dkt. 528, pg. 56). It was up to the jury to decide whether to rely upon that testimony. *Id.* The jury was, therefore, free to reject Djinis' conclusions.

## 2. Cross-Examination of Defense Experts

Caro contends the District Court erred when it permitted the government to question defense witness Tillman about his violation of the sequestration rule and defense witness Diaz-Yabor about his prior felony conviction that was nearly three-decades old.

### a. Tillman Sequestration

Caro contends the District Court improperly instructed the jury that it could consider that defense expert Tillman violated the rule of sequestration by reviewing the government witnesses' testimony; while other witnesses had been barred from doing so.

Ralph Tillman, a former IRS agent, was called by Chaoui as an expert in the area of the BSA. (Dkt. 518, pg. 220). After being certified as an expert, defense counsel Garvin began questioning Tillman about his preparation for formulating an opinion about the CTRs filed by La Bamba. Id. at 222. Tillman was asked if, in this preparation, he had reviewed the trial testimony of Miguel Obispo, Elaine

Becerra, and Peter Djinis.  Id. at 222-23.

Thereupon, the government asked for a side-bar where it was explained that Tillman had reviewed transcripts from the trial.  The government moved to strike Tillman's testimony, and disqualify him for a violation of the rule of sequestration.[28]  After listening to argument of counsel, the District Court found a violation of the sequestration rule, but one that was neither intentional nor in bad faith.  (Dkt. 519, pg. 21).  Relying upon United States v. Diaz, 248 F.3d 1065, 1104 (11th Cir. 2001), the District Court denied the government's motion, but allowed the government to question Tillman regarding the "nature of the violation."  (Dkt. 519, pg. 22).  The District Court also indicated that the jury might be instructed at the close of the trial that they could consider Tillman's review of the testimony in evaluating his testimony.  Id.  During cross-examination, the government questioned Tillman about the violation of the sequestration rule.  (Dkt. 519, pgs. 67-68).

At the close of the trial, the District Court instructed the jury, "[y]ou also heard testimony that Ralph Tillman reviewed transcripts of previous testimony provided during this trial while other witnesses were instructed not to do so.  In evaluating Mr. Tillman's testimony, you may consider the fact that he reviewed

---

[28]  The rule of sequestration, from Fed.R.Evid. 615,  provides that at the request of a party, the court must order witnesses who will be testifying excluded from the proceedings so that they cannot hear the testimony of the other witnesses.

transcripts of previous testimony before testifying." (Dkt. 528, pg. 56). Earlier during the charging conference, the parties discussed this instruction with the Court, (Dkt. 521, pgs. 27-28), and after the District Court read the final proposed instruction there was no objection.

"'[I]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.'" United States v. Silvestri, 409 F.3d 1311, 1327-1328 (11th Cir. 2005)(citing United States v. Ross, 131 F.3d 970, 988 (11th Cir.1997)). The invited error doctrine "'is implicated when a party induces or invites the District Court into making an error.'" Id. (citing United States v. Stone, 139 F.3d 822, 838 (11th Cir.1998)). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." Id. (citing Ford ex rel. Estate of Ford v. Garcia, 289 F.3d 1283, 1294 (11th Cir. 2002)). Neither Caro, nor any other defendant, objected to the instruction.[29]

---

[29] In the Reply Brief, Caro maintains that the defendants did, in fact, object to this jury instruction. However, the record belies such an assertion. When the expert witness instruction was addressed, during the charge conference, defense counsel Garvin stated,

> Your Honor, our position is that, while we request strictly the pattern instruction without the third paragraph [the one discussing the sequestration violation], if the Court is so inclined to give a third paragraph, that the third paragraph in our proposed instruction be given as opposed to the third paragraph in the Government's.

(Dkt. 521, pg. 24). Thereupon the District Court presented possible language for the instruction. Garvin once again expressed his concern,

> Your Honor, while that is certainly better from Defendant Chaoui's point of view than what was proposed by the Government, the problem here is that, without an expansion that it was unintentional, it makes it seem like Mr. Tillman was

60

Therefore, we need not review it. Moreover, even if we were to consider the District Court's jury instruction, such an instruction was not a misstatement of the law and the District Court was completely within its discretion to craft the wording employed. United States v. Jimenez, 780 F.2d 975, 981 (11th Cir. 1986)(concluding the district court "adequately responded to the possibility of prejudice by specifically instructing the jury" that a violation of the sequestration rule had occurred, and that violation could be used in evaluating the credibility of the witness.). See also United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008)(stating that jury instructions are reviewed *de novo* as to whether they misstate the law, but the District Court is given wide latitude in crafting the language of the instruction).

### b. Diaz-Yabor Conviction

Caro maintains the District Court improperly allowed the government to

---

purposely playing, for lack of a better term, fast and loose with the rules.
    And on cross-examination, the Government did cross-examine him, I thought, for a significant period of time on this issue.

(Dkt. 521, pg. 26). Defense Counsel Garvin then again requested the word "unintentional" be placed in the instruction. Id.
    After more discussion, the District Court suggested this language: "You also heard testimony that Ralph Tillman reviewed transcripts of previous testimony provided during this trial while other witnesses were instructed not to do so. In evaluating Mr. Tillman's testimony, you may consider the fact that he reviewed transcripts of previous testimony before testifying." (Dkt. 521, pg. 27). Thereupon, defense counsel Garvin stated, "We have no objection to that;" counsel for La Bamba stated, "No objection, your Honor;" and counsel for Caro stated, "No objection, your Honor." (Id. at 27-28).

question Martin Diaz-Yabor, Caro's construction industry expert, about a 27-year-old felony conviction. Caro insists that the government failed to give the requisite notice as required by Federal Rule of Evidence 609(b) prior to utilizing the conviction. Caro insists the impeachment of this expert was of critical importance because Diaz-Yabor would be testifying concerning "the real world business and regulatory environment." (Blue Brief, pg. 68).

Diaz-Yabor was called as a witness by Caro. After introductory questions, Diaz-Yabor was asked about his educational background. During questioning by the government, however, Diaz-Yabor admitted to a felony conviction from when he was eighteen or twenty years old.

Caro moved for a mistrial for the government's improper impeachment of the witness through the use of a conviction more than ten years old.[30]

---

[30] In denying the motion, the District Court summarized the circumstances giving rise to the motion:

> On December 19, 2008, Defendant Juan Rene Caro called Martin Diaz-Yabor as an expert witness on the ordinary and customary business practices within South Florida's construction industry . . . . In certifying Mr. Diaz-Yabor as an expert, Defendant relied in part on Mr. Diaz-Yabor's educational background. Mr. Diaz-Yabor's resume provided by Defendants did not list dates next to his college degrees.
>
> ****
>
> After Defendant tendered him as an expert witness, the government was allowed to voir dire Mr. Diaz-Yabor. (Id. at 6.) The government prosecutor, Wilfredo Fernandez, began his voir dire by asking Mr. Diaz-Yabor about his resume and the undated educational background listed thereon. In response to the government's

questioning, Mr. Diaz-Yabor stated that he received a bachelor's degree in accounting and finance from Troy State University in 1985. The following exchange then occurred between the witness and Mr. Fernandez:

MR. FERNANDEZ: When did you attend -- when did you start at the University of Miami?
THE WITNESS: 1976
MR. FERNANDEZ: And when did you get your degree from the University of Miami?
THE WITNESS: 1981, '89, '92, I believe, in that order.
MR. FERNANDEZ: What did you do from 1981 to 1985?
THE WITNESS: What did I do?
MR. FERNANDEZ: Yes.
THE WITNESS: I -- let's see. 1981 to 1980 --
MR. FERNANDEZ: No. That would be backwards. 1981 to 1985.
THE WITNESS: 1981, I was in -- I was up in Alabama.
MR. FERNANDEZ: In Alabama?
THE WITNESS: Yes.
MR. FERNANDEZ: I'm sorry. I'm not following you. When did you start at Troy State?
THE WITNESS: Around 1982 or '83.
MR. FERNANDEZ: And when did you graduate from Troy State?
THE WITNESS: 1985.
MR. FERNANDEZ: Then when did you go to the University of Miami?
THE WITNESS: 1976 to '81.
MR. FERNANDEZ: So you were both attending the University of Miami and Troy State?
THE WITNESS: No, sir. 1976 to 1981, I went to the University of Miami.
MR. FERNANDEZ: And --
THE WITNESS: Okay. 1976 to 1980, I was enrolled as a bachelor -- going for a bachelor's of fine arts in graphic and industrial design.
MR. FERNANDEZ: Okay.
THE WITNESS: After I did my bachelor's in science in accounting and finance. [*sic*] 1989, I came back. I had sufficient credits because I was a double major at the University of Miami from 1988. I completed my bachelor's in architecture and continued into my master's in architecture and graduated from the master's in architecture in 1992.
MR. FERNANDEZ: What did you do during the time period between finishing at Troy State and finishing at the University of Miami?
THE WITNESS: I was studying for -- and out in the field studying and working in the construction industry.
MR. FERNANDEZ: Where was that?
THE WITNESS: Here in Miami, in Florida.

Later, during cross-examination, Mr. Fernandez revisited the chronology of the witness's educational background:

MR. FERNANDEZ: You attended Troy State University in Montgomery, Alabama, from what year to what year?
THE WITNESS: I believe it was '83 to '85.
MR. FERNANDEZ: And where did you live when you were attending Troy State?
THE WITNESS: I lived in --
MR. FERNANDEZ: You don't have to give me the address.
THE WITNESS: -- in Montgomery
MR. FERNANDEZ: Did you live in a dorm with -- at the university?
THE WITNESS: Yes. Kind of.
MR. FERNANDEZ: What do you mean?
THE WITNESS: I was in Montgomery, Alabama, in the Air Force station there.
MR. FERNANDEZ: What were you doing in the Air Force station?
THE WITNESS: I was in a -- in a camp.
MR. FERNANDEZ: What kind of camp?
THE WITNESS: A federal camp.
MR. FERNANDEZ: What kind of federal camp?
THE WITNESS: A federal camp, a federal prison camp.
MR. FERNANDEZ: It was a prison camp, was it not?
THE WITNESS: Yes, sir.
MR. FERNANDEZ: Why were you in the prison camp?
THE WITNESS: I did a boo-boo when I was 18, 20 years old.  I mean I -- something stupid when you're a kid.
MR. FERNANDEZ: And when you say "boo-boo," do you mean conspiracy to traffic in cocaine?
THE WITNESS: That's correct.
MR. FERNANDEZ: And how many years were you sentenced to?
THE WITNESS: Ten.
MR. FERNANDEZ: And that's when you went -- you were attending Troy State while in prison. Correct?
THE WITNESS: That's correct.
MR. FERNANDEZ: And you were arrested subsequent to that, were you not?
THE WITNESS: It was from the same case
MR. FERNANDEZ: Or --
THE WITNESS: From -- from being in Montgomery. I'm sorry.
MR. FERNANDEZ: Well, actually, you were arrested in Tallahassee for possession of marijuana. Wasn't that --
THE WITNESS: No. That was -- came from Montgomery when I was there. It was -- the guy that was there and -- kind of did a setup.  And that's why I was -- the judge actually excused me -- well, he didn't give me a -- you know, a real harsh sentence

64

Ultimately, the District Court concluded that Rule 609(b) and its time limitations on prior convictions did not apply.  Id. at 9.  Rather, this impeachment evidence fell under Rules 402 and 403, and there are no time limitations applicable here.  Id.[31]  The District Court further concluded, "this evidence was highly

because he understood that. But what is this relevant to the case, this case?

MR. FERNANDEZ: I'm asking you about your background because you were -- I found you evasive.

THE WITNESS: We all make mistakes. I mean, it's nothing --

MR. FERNANDEZ: Absolutely. But among your areas of expertise, we can now include conspiracy in that, would we not?

THE WITNESS: Wait a minute. I don't think so, sir. I think that from that time on, it's very clear that I have gone into society, I have done what I have done. I got my degrees, my license, I practiced with integrity and honesty. And you can check everything else you want. And I don't have anything to hide.

MR. FERNANDEZ: Okay. I was just concerned because there was no dates on the resume. Is it fair to say --

THE WITNESS: No. There are dates in the resume.

MR. FERNANDEZ: Not regarding your education.

THE WITNESS: Yes, sir, they are.

MR. FERNANDEZ: Okay. Let me -- Can you put up the ELMO for me, Judge?

THE COURT: Yes. It's on.

(Dkt. 356, pgs. 2-5).

[31] The District Court explained the government's justification for the use of the conviction:

[T]he government denies that it knew ahead of time that Mr. Diaz-Yabor had a prior criminal conviction. Instead, the government contends that it thought that the criminal history report it had pulled up on Martin Augusto Diaz, a/k/a Martin Diaz, a/ka [sic] Martin A. Diaz, a/ka [sic] Martin Diaz-Yaber was another person, and the prosecutor was only alerted that this might be the same person as Mr. Diaz-Yabor after he was evasive during questioning of his educational background. Further, the government contends that Mr. Diaz-Yabor's testimony is essentially irrelevant, that the defense waived any objection to the government's questioning of Mr. Diaz-Yabor's background by failing to object at the time, that the government's questioning of Mr. Diaz-Yabor regarding his criminal history was brief and was limited to addressing his honesty and credibility, and that any harm to the defense

65

probative of Mr. Diaz-Yabor's educational background and work experience, two of the indicium forming the basis of his expert opinion. Further, any prejudicial effect on Defendants was minor." Id. at 12.

We review a district court's decision "to admit evidence of prior convictions pursuant to Rule 609" for an abuse of discretion. United States v. Pritchard, 973 F.2d 905, 908 (11th Cir. 1992). "'[E]videntiary and other non-constitutional errors do not constitute grounds for reversal unless there is a reasonable likelihood that they affected the defendant's substantial rights; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted.'" United States v. Christopher, 923 F.2d 1545, 1550 (11th Cir. 1991) (quoting United States v. Hawkins, 905 F.2d 1489, 1493 (11th Cir.1990)).

Under Fed. R. Evid. 609, a witness, other than the defendant, may be impeached with a prior conviction if the crime was punishable by more than one year of imprisonment. Fed. R. Evid. 609(a)(1). Evidence of convictions more than 10 years ago, however, are not admissible unless the court determines that the probative value of the conviction substantially outweighs its prejudicial effect and

---

through Mr. Diaz-Yabor's impeachment is minor and can be cured by a limiting instruction by the Court.

(Dkt. 356, pg. 8).

66

the "adverse party is given sufficient written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence." Fed. R. Evid. 609(b).

"This circuit has held that a presumption exists against the use of prior crime impeachment evidence over ten years old and that such convictions 'will be admitted very rarely and only in exceptional circumstances.'" United States v. Tisdale, 817 F.2d 1552, 1555 (11th Cir. 1987) (quoting United States v. Cathey, 591 F.2d 268, 275 (5th Cir.1979)). To determine whether exceptional circumstances are present, the district court "must consider whether the witness has already been impeached, and if so, the probative value of the prior conviction decreases accordingly." *Id.* (quotation and citation omitted).

We observe there was no timely contemporaneous objection by Caro to this testimony.[32] Accordingly, we conclude that Caro has waived this issue by failing to raise an objection pursuant to Fed. R. Evid. 103. See United States v. Blackshear, 568 F.2d 1120, 1121-22 (5th Cir. 1978) (finding lack of timely, specific objection waived noncompliance with Rule 609).[33]

Nevertheless, even assuming, *arguendo*, this issue was not waived, it was

---

[32] Diaz-Yabor testified on December 19, 2008. No objection to this testimony was filed until Caro's Motion for Mistrial filed on December 26, 2008. (Dkt. 356).

[33] We have adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

harmless. The weight of the evidence against Caro, which included his own statements, the statements of his co-conspirators, was more than sufficient to convict him. Moreover, Diaz-Yabor's testimony which essentially argued that all the other construction companies were doing this type of activity is no defense at all to the charges. In fact, such testimony contradicted the other testimony about Caro's actions. The jury was free to disregard Diaz-Yabor's testimony as they so chose.

### 3. Exclusion of Testimony

The District Court, according to Caro, erroneously sustained a government objection to questions posed during cross-examination of Marvin Marroquin, a government witness. Marroquin, Spirit's President, was asked whether he, Obispo, and Alfred Ortega discussed the presence of OSHA inspectors at a construction site under Spirit's insurance certificate. (Dkt. 556, pgs. 85-86). This testimony, according to Caro, would have supported the reasonable suggestion that the companies he was dealing with were not merely shell corporations but actual construction corporations, and should not have been excluded. The exclusion of this testimony bolstered the government's "otherwise unsupported deliberate ignorance theory."[34]

---

[34] In his brief, Caro states that the "District Court also erred in admitting extraneous, prejudicial evidence concerning the government informant's criminal activities predating the

During cross-examination, Caro's counsel repeatedly sought to ask Marroquin about OSHA inspectors at job sites that Spirit was associated with. During a sidebar, Caro's counsel argued this testimony was admissible because the government opened the door by asking Marroquin about Spirit's fictitious nature. (Dkt. 556, pg. 88). This testimony, according to counsel, would have tended to show that Spirit was engaged in legitimate business activities. Id.

When asked by the District Court why this testimony was not hearsay, Caro's counsel attempted to justify the questions multiple ways. Id. at 88. First, counsel asserted it was not hearsay because it was part of a recorded conversation. Id. Second, counsel suggested the entire conversation should be admitted under Rule 801(d)(2)(E). Id. at 89. Finally, counsel argued the statements were not being admitted for the truth of the matter asserted, id. at 90, but rather to show the effect upon the listener, Marroquin. Id. at 92.

Ultimately, the District Court excluded the testimony and explained it was "not relevant. Not probative of any defense concerning any of the Defendants. There's been no indication of any nexus of these conversations that would relate to the Defendants' knowledge or lack of knowledge as to what Spirit Construction

_____

indictment period, other government investigations of La Bamba not involving the charges against Caro, and unredacted, misleading corporate records concerning their active status." (Blue Brief, pg. 69). These "catch-all" objections lack specificity and are not plainly presented, and accordingly, they will not be addressed. United States v. Jernigan, 341 F.3d 1273, 1284 n.8 (11th Cir. 2003).

69

did or did not. And it's hearsay." Id. at 94-95.

We review a District Court's evidentiary ruling for an abuse of discretion. United States v. Magluta, 418 F.3d 1166, 1177 (11th Cir. 2005). A district court's decision on evidentiary rulings will only be reversed if "the resulting error affected the defendant's substantial rights." United States v. Dodds, 347 F.3d 893, 897 (11th Cir. 2003). The District Court held that Caro had not shown any connection between the potential appearance of OSHA inspectors at Spirit's job sites and Caro's knowledge or lack thereof. This ruling was not an abuse of discretion.

Interestingly, Caro does not now argue that this testimony was not hearsay.[35] Instead, he maintains that this excluded evidence bolstered the government's unsupported deliberate ignorance theory. Such an assertion is belied by the evidence against Caro, including Marroquin's own testimony. Marroquin, Spirit's President, had previously testified that Spirit was created not for construction work, but for the sole purpose of cashing checks to evade taxes.

The fact that OSHA inspectors may have come by does not alter the testimony that Spirit was a shell company and not involved in actual construction. Spirit was still a registered corporation in Florida but that does not mean that they were in the actual construction business. The testimony shows that they were

---

[35] Fed. R. Evid. 801(d)(2) provides that the statement being offered must be offered against a party to qualify under 801(d)(2)(E).

supposed to appear as a legitimate construction company so OSHA inspectors coming by would not change its character.

### 4. Defendant's Closing Argument

Caro maintains that in striking certain portions of the defense closing argument, the District Court "[f]ailed to accurately explain the extent of its ruling and thus left it to the jury to determine how much of the defense closing it would consider." (Blue Brief, pg. 70). Caro, further, contends that the striking of this argument was particularly harmful because this "evidence that was to be addressed and explained away by defense counsel improperly appeared in the jury room and played a role in deliberations." Id.[36]

During closing argument, Caro's counsel made the following argument:

> Another red herring was the checks from Carlos Benitez. Again, Mr. Obispo said that the checks from Carlos Benitez were Medicare fraud checks. Well, let's look at these checks. This is Exhibit 486 from the Government.

(Dkt. 527, pg. 38). The government objected claiming that it had been precluded from presenting evidence of Caro's other ongoing criminal investigations by the District Court's ruling on a Motion in Limine, the defense was arguing that evidence in closing. Id. at 39.

The District Court sustained the objection and instructed the jury in the

---

[36] This portion of the argument will be addressed *infra*.

71

following manner: "I have struck the last few portions of the statements made by Mr. Black. He's been instructed to go into another area. You are to disregard any statements in this area." Id. at 47. This instruction, according to Caro, lacks specificity and created the risk that the jury disregarded more of the argument than necessary.

A District Court "has broad discretion over the scope of closing argument." United States v. Gaines, 690 F.2d 849, 858 (11th Cir.1982). "Absent a showing of an abuse of discretion the district court will not be reversed for limiting summation as long as the defendant has the opportunity to make all legally tenable arguments that are supported by the facts of the case." Id.

We must be clear. Caro is not arguing that he should have been permitted to continue his argument or that the District Court erred in limiting his closing argument. Instead, Caro's contention is that the language of the limiting instruction left the jury without sufficient guidance on the amount of the closing argument to disregard.

Under the invited error doctrine, however, we will not consider an argument on appeal when the party making the argument invited or induced the district court into making the alleged error. United States v. Love, 449 F.3d 1154, 1157 (11th Cir. 2006). Here, Caro committed the error by making an improper argument

during closing. Then, once the District Court acted to correct this error, Caro had no objection to the curative instruction.

Moreover, the record reflects the sound exercise of discretion by the District Court. Evidence of other criminal investigations into Caro had previously been excluded from the trial, and it was not error to keep this from the jury. Finally, there is no question that this isolated instruction from the District Court did not render Caro's trial unfair.

### 5. Comment on Silence

Caro asserts that the government elicited testimony from Obispo that compromised his right to remain silent. The following exchange occurred during the government's direct examination of Obispo:

> Q. And he goes on to say on Page 16, Line 8, "Not counting the strange people."
> What did you understand the reference to the "strange people" to mean?
> A. Fictitious corporations.
> Q. You asked Mr. Caro, "But you also have strange people, and that's worth something," to which Mr. Caro responds, "No, Migue. I no longer have anything." And what did you understand that to mean?
> A. Well, I tell you what I understand and what I do not understand. I understand that he's telling me that he doesn't have these corporations in his -- or within his business. But on the other hand, I understand that he accepted the fictitious companies -- corporations I bring in to him.
> Q. And how so?
> A. He knows that all the corporations we were cashing checks for are fictitious corporations. About that, there's no -- well, I mean, I don't

73

have the least doubt about that. Well, if he claims that DJ is a legit corporation -- that may be one that he may mention – I would say it's not a --

(Dkt. 552, pgs. 78-79).[37]

At sidebar, Caro's counsel argued this was a comment on Caro's right to remain silent. Id. at 79.[38] The government responded that Obispo was simply commenting on the conversation on the tape recording. Id. at 80.

The District Court directed the government's attorney to clear up any ambiguity with the next question, id., and that was done. The next question and answer given were:

> Q. Mr. Obispo, referring you back to Page 17, what did you understand Mr. Caro to mean when he told you, "I no" -- I'm on Line 12 -- "I no longer have anything"? What was he referring to in this conversation?
> A. He's making reference to the fact that within his own corporation no shell companies or corporations are in operation.

Id. at 81.

To determine if there has been an impermissible comment on a defendant's right not to testify at trial, "the district court must consider, whether the statement was manifestly intended or was of such character that a jury would naturally and

---

[37] This passage concerns a conversation between Caro and Obispo, where Obispo was explaining Caro's reference to "strange people" as a reference to the fictitious corporations and that Caro's statement, "I no longer have anything" was Caro's attempt to disassociate himself from these corporations.

[38] Caro did not move for a mistrial based on the comment.

necessarily take it to be a comment on the failure of an accused to testify." United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999). In determining the appropriateness of the statement, "the court must consider the circumstances in which the statement was made." Id.

This testimony by Obispo was not a comment on Defendant's right to remain silent, and the District Court cleared up any ambiguities by requiring the government to ask Obispo a follow-up question.

### 6. Government Misconduct

Throughout the trial, according to Caro, the government engaged in conduct that inappropriately focused the jury's attention away from the facts of the case and onto character assassination of defense counsel, Caro and Caro's family. Caro asserts that these "prosecutorial excesses" denied him a fair trial. (Blue Brief, pg. 72).

We review claims of prosecutorial misconduct *de novo* because they involve mixed questions of law and fact. United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997). "To establish prosecutorial misconduct, '(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant.'" Eckhardt, 466 F.3d at 947 (quoting United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir.1991)). The substantial rights of a defendant are

"prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would have been different." Id. (citing United States v. Wilson, 149 F.3d 1298, 1301 (11th Cir.1998)). Nevertheless, if the record reveals "sufficient independent evidence of guilt," the prosecutorial error may be harmless. United States v. Adams, 74 F.3d 1093, 1097–98 (11th Cir.1996).

While lengthy, we consider it necessary to review each of the alleged acts of impropriety. Below are the comments Caro complains of from the record.[39] Some of these comments are made during argument and others during objections. Caro also complains about other remarks made outside of the presence of the jury, but we need not address these as they would not have impacted the jury's verdict. Below are the statements, which are delineated in "a through fff," as reflected in the initial and reply briefs:[40]

a. During the cross-examination of Gonzalez by Grimberg, the government asks the following question:

> Whether you physically prepared the CTRs or not, Mr. Gonzalez, you told the agents that you knew that this is how it was being done.

---

[39] Caro points to allegedly improper comment in both the initial and reply briefs. We address all the comments Caro mentions.

[40] For reference in these quotes, Messrs. Fernandez and Grimberg represent the government.

You told them that you knew that the individuals identified in the CTRs were not the individuals coming in to cash those checks.

You told them that, didn't you?

(Dkt. 343, pg. 258).

b.  This exchange occurred outside the presence of the jury.  (Dkt. 343, pg. 263).

c.  The government asked Agostinho this question: "Now, when Yuri came back after meeting with Mr. Caro, did he have a company that he now miraculously worked for?"  Defense counsel interposed an objection and the question was withdrawn.  (Dkt. 558, pgs. 173-74).

d.  During the cross-examination of Diaz-Yabor, the District Court hearing argument on an objection.  The government stated, "That's the real issue in the case, Judge."  (Dkt. 564, pg. 71).

e.  Caro cites to a portion of the record, (Dkt. 344, pgs. 122-23), that does not exist.  This transcript (Dkt. 344) only includes pages 1-24.

f.  Caro cites to a portion of the record, (Dkt. 345, pg. 149), that does not exist.  This transcript (Dkt. 345) only includes pages 1-38.

g.  During rebuttal argument to the jury, the government stated:

the day before that this was some sort of competitive event, that I was here to win at all costs.

This isn't a football game. I am not an attorney for hire. I am a prosecutor who is presenting in a court of law the evidence that the Judge admits and that is presented to the jury and the jury decides whether someone's guilty or not guilty.

And the suggestion that there's going to be a big parade in my honor when I win this is spurious, to be quite candid with you.

But having said that, I want to walk with you through some of the statements that were made by the defense counsel in the last two days and remind you of some of the evidence that contradicts those statements.

The fact that I did a PowerPoint to present my evidence in an organized and quick manner seemed to have aggravated some of the attorneys. So I did another one.

(Dkt. 528, pg. 6).

h.  Again during rebuttal argument the government stated:

To suggest somehow that I, you know, tampered with the evidence in some way by preparing witnesses for testimony is disingenuous. Everybody does it, and it's correct. That's what you're supposed to do.

Imagine coming in here -- this trial would have been six months with me on all fours, looking through boxes, trying to find the evidence, "And so what happened next?", "And so you like working at La Bamba?"

This would have gone on till February. So there's nothing wrong with meeting with witnesses.

And when I cross-examine my witnesses and prepare them for cross-examination, I'm doing so so [*sic*] that they know what to expect, what -- the questions that they think need to be responded to.

It's what their memory is. It's what they saw, observed, heard. That's what they can testify to, not what I want them to testify to, but what they remember.

There's been all sorts of sprinkled -- I don't know where this came up in this case, the suggestion that all the bad things happened on Friday at La Bamba.

(Dkt. 528, pg. 47-48).

i. The following exchange occurred during the direct examination of Becerra:

BY MR. FERNANDEZ:
Q. Ms. Becerra, is this the first time you've testified in a court?
A. Yes.
Q. I noticed that several members of the Defendants' families are here to listen to your testimony. Does that make you uncomfortable at all?
MR. HERNANDEZ: Judge, I object to this.
THE COURT: Sustained.
MR. HERNANDEZ: I ask to strike.
THE COURT: The jury is instructed to disregard the last question.
MR. FERNANDEZ: I was going to ask if she wanted permission to clear the courtroom, Judge, if she's uncomfortable.
MR. ALTER: I object to that, Judge.
THE COURT: Just go ahead.
MR. ALTER: The prosecutor knows better than these stunts.
THE COURT: Just ask your questions,

(Dkt. 559, pgs. 143-44).

j. This discussion occurred out of the presence of the jury when defense counsel sought a mistrial. (Dkt. 559, pgs. 171-79).

k. During the cross examination of Becerra, the government repeatedly objected to a question about what time Caro finished work at La Bamba at night.

79

After attempting to rephrase a question a number of different ways, the government

objected in the following manner:

> MR. FERNANDEZ: Wow. Objection. It's the exact same question we asked five minutes ago.
> THE COURT: Sustained.
> MR. HERNANDEZ: Is the Court's ruling that I'm not –that this is irrelevant to the overall structure of the business? And then I will go move on to another area.

(Dkt. 560, pgs. 71).

l. The following exchange occurred during the cross examination of Jenkins:

> Q. And you would agree that this is an example of at least an attempt to be in compliance with the law. Is that correct?
> MR. FERNANDEZ: Objection, Judge.
> THE COURT: Sustained.
> BY MR. HERNANDEZ:
> Q. You would agree that that [*sic*] is a demonstration of La Bamba wanting to be in compliance?
> MR. FERNANDEZ: Good grief. Objection.
> THE COURT: Sustained.

(Dkt. 562, pg 115).

m. Caro cites to a portion of the record, (Dkt. 347, pg. 107), that does not

exist. This transcript (Dkt. 347) only includes pages 1-101.

n. The cross examination of Chaoui began in the following manner:

> BY MR. HERNANDEZ:
> Q. Mr. Chaoui, good afternoon.
> A. How are you?
> Q. I'm good. Thank you.
> You were hired in August of 2005. Right?

80

A. Yes. Yes.
Q. And you indicated on direct examination that
you'd spent 25 years in the banking industry?
A. Yes.
Q. I assume you're proud of your work when you were
in the banking industry.
A. I would hope so.
Q. You learned a lot?
A. Possibly. Yes.
Q. Did you consider yourself a thoroughly trained
individual in the profession of banking after 25 years?
A. In certain fields more than others, yes.
Q. And did you share -- do you share the opinion of
all of those people who came in here and talked about
your work ethic? Do you consider yourself a
hardworking person?

(Dkt. 346, pg. 118).

o. This portion of the record contains nothing objectionable. (Dkt. 346, pg. 76).

p. Caro cites to a portion of the record, (Dkt. 344, pgs. 30-33), that does not exist. This transcript (Dkt. 344) only includes pages 1-24.

q. The following questions and answers are from the government's cross examination of Chaoui:

Q. Okay. Now, you were arrested almost a year ago.
Correct?
A. Yes, sir.
Q. And you have had a year to sort of think about this case. Is that fair
to say?
A. Absolutely, sir.

Q. And you've reviewed the evidence in this case both with your attorney and with your brother-in-law, who is an attorney. Correct?
A. Yes, sir.
Q. You've reviewed the undercover tapes that pertain to you?
A. Yes.
Q. You've reviewed other undercover tapes as well?
A. Yes. I believe there has been others, yes, where I believe my name was mentioned or they stated that it was referenced.
Q. You've reviewed the index that has 493 undercover recordings, the date they were recorded and the people talking on the tapes. Correct?
A. Yes, sir.
Q. And you've reviewed most, if not all, of the hundreds of boxes of records seized in the search warrant.

(Dkt. 347, pg. 64).

r. The government objected to a Caro's closing argument as follows: "MR. FERNANDEZ: Objection, Judge. That completely assumes facts that were not in evidence." (Dkt. 526, pg. 212).

s. Caro cites to a portion of the record, (Dkt. 344, pgs. 123-24), that does not exist. This transcript (Dkt. 344) only includes pages 1-24.

t. The government stated the following during closing argument to the jury:

They all had bank accounts. But the reason they're coming to La Bamba is to not pay the taxes on it. That's the scheme. And that's what makes it worthwhile to pay 5 percent of the face value.

I work very hard for my money, as I'm sure you do. You're going to have to pry 5 percent out of my cold, dead fingers before I'm willing to do that unless there's some benefit to me.

The benefit is you don't have to pay taxes on it. That's going to cost – the taxes that you're going to have to pay – the – on payroll taxes, on whatever income tax is assessed to you, the cost of workers' comp, that's much more expensive than 5 percent.

82

So it's sort of a deal. If it wasn't for, again, that pesky illegal part, it would actually be a very good deal.

The checks that Donadio wrote to Mira and to DJ were unendorsed when delivered. What does that mean? We kept hearing about endorsed and unendorsed checks, the fact that La Bamba stamps these checks without knowing who these people are, are these people authorized to sign checks.

They have their own little rubber stamp and just flop it on the check. So Peninsula Bank thinks . . . .

(Dkt. 526, pg. 45).

u.  Again, during closing argument to the jury:

I want you to think about September 5th, 2007, when Mr. Gonzalez tells Mr. Obispo to -- that they need to stagger the deposit of the checks so as not to make a stir with the bank, that stir being the bank's efforts to comply with the Bank Secrecy Act.

And I want you to think about September 13th, 2007, and all of the videos involving Mr. Caro where he whispers, where he gestures, where he talks about strange people and Miquinbins and dead people and people in jail.

These, ladies and gentlemen -- these are the faces of guilty men.

After you review all of the evidence and after you deliberate and review the testimony, the documents, the videos, the transcripts, we submit to you that there is only one conclusion that you can reach, and that is that these Defendants are guilty beyond any reasonable doubt.

(Dkt. 526, pg. 178).

v.  The following occurred during questioning of a witness by the government:

BY MR. GRIMBERG:
Q. Given that example, Mr. Gonzalez, do you see now why the filing of CTRs would help combat against tax fraud?
MR. ALTER: Objection as to form.

83

THE COURT: Sustained.
Rephrase your question.
MR. GRIMBERG: I'll move on.

(Dkt. 343, pg. 180).

w. The only government conduct here involved interposing two objections.

(Dkt. 347, pgs. 79-81).

x. Caro cites to a portion of the record, (Dkt. 345, pg. 119), that does not

exist. This transcript (Dkt. 345) only includes pages 1-38.

y. The following exchange occurred during the redirect of Donadio:

Q. And did you, in fact, retain an attorney after that meeting?
A. Yes, I did.
Q. And did you meet with the agents again after meeting with your attorney?
A. Yes. After talking to my attorney, we did.
Q. And since retaining your attorney – Mr. Weisberg – have you been completely truthful and open with the investigators?
A. Yes, I have.
Q. And have you been completely truthful in your testimony in this trial today and yesterday?
A. Yes.
MR. GARVIN: Objection, your Honor.
THE COURT: Sustained.
BY MR. GRIMBERG:
Q. What is your understanding, Mr. Donadio, about the consequences if you were to provide untruthful testimony during the trial?
MR. GARVIN: Objection.
THE COURT: Overruled.
THE WITNESS: What was the question?
BY MR. GRIMBERG:
Q. What is your understanding of the consequences if you were to provide untruthful testimony during your testimony today?

84

A. I don't know.

Q. Have you been truthful, to the best of your knowledge?

MR. GARVIN: Objection, your Honor.

THE COURT: Sustained.

THE WITNESS: Yes, I have.

THE COURT: Sir, if I sustain the objection, you can't answer the question.

THE WITNESS: Oh, okay. Sorry.

MR. GRIMBERG: No further questions, your Honor.

THE COURT: You may step down, sir.

(Witness excused.)

(Dkt. 558, pgs. 52-53).

z.      The following exchange occurred during the redirect examination of

Dieppa:

. . . US Attorney's Office during your second meeting?

MR. BLACK: Objection.

THE COURT: Sustained.

Rephrase your question.

BY MR. GRIMBERG:

Q. Did you tell the truth?

A. Yes, sir.

MR. BLACK: Objection.

THE COURT: Sustained.

MR. BLACK: Move to strike.

THE COURT: The motion to strike is granted.  The jury is instructed to disregard the
question and answer.

BY MR. GRIMBERG:

Q. Now, since you have been retained by an attorney, have you been candid and honest with law enforcement regarding all of their questions concerning this case?

MR. BLACK: Objection.

THE WITNESS: Yes, sir.

THE COURT: Grounds?

85

MR. BLACK: Conclusion of the witness.
THE COURT: Overruled.
MR. BLACK: And vouching.
THE COURT: I'm sorry?
MR. BLACK: And vouching.
THE COURT: Sustained as to vouching.

(Dkt. 561, pg. 207).

aa. The proceedings occurred outside the presence of the jury and could not have affected the verdict. (Dkt. 343, pg. 263).

bb. The proceedings occurred outside the presence of the jury and could not have affected the verdict. (Dkt. 548, pgs. 79-80).

cc. The following is a lengthy portion of the government's closing argument:

> put in his father's name; Huber Construction Company, which is in the name of Flora Valle, Oscar Valle's mother -- what a coinkidink. They all end in "Valle" -- Mira Construction Group, Inc., which he put in the name of Miguel Ramirez; DJ Construction Group, where he used his aunt and later tried to cheat her out of commissions; and SNF Construction Group, which is in the name of Francisco Ortega.
>
> So here's a guy who's sitting in the lobby and getting commissions; for what, we're not quite sure. "Oh, but that happens all the time in the construction industry." Does it? This is how you work in construction? You have to create a fake company and then pay someone a kickback in order to use the company? Hmm.
>
> Between all five companies, La Bamba filed false CTRs totaling $60 million. Now, you look at that guy. Does that look like a guy who's responsible for 60 million dollars' worth of construction work? "Well, you know, we really didn't check. There was so many checks coming in. We're not really sure." Hmm.

The recruiters also included Maria del Carmen Martinez, who you heard from. She was responsible for a company called San Construction. The company was set up by her husband, something that my mother refers to as "marrying poorly."

The company was set up by Nelson Flores to allow others to cash checks in the name of San Construction with the purpose of avoiding paying income taxes and workers' compensation insurance.

Ms. del Carmen Martinez, if you'll recall, was wearing a prison uniform because she's currently serving a prison sentence in connection with her role for cashing checks at Cashflow on behalf of her husband and this company.

She collected fees at Cashflow based on checks cashed for San Construction which totaled $4 million. Again, great work if you can get it. You get a commission on all these checks. You don't have to actually do construction work. You just stop by your local check-cashing store and get your commission.

You heard from Jose Arroliga, who is also getting ready to surrender to serve his prison sentence -- 18 months, he told us -- for the creation of Baba Construction and WF Construction.

The company was set up in the name of his buddy, Orlando Cajinas, in order to allow others to cash checks and collect fees at Cashflow.

Mr. Arroliga tells us, like the other recruiters, there's no construction work going on at . . . .

(Dkt. 526, pgs. 28-29).

dd.  This is a repeat of X.  (Dkt. 558, pgs. 52-53).

ee.  This exchange occurred during the direct examination of Agostinho by the government:

BY MR. GRIMBERG:
Q. So, Mr. Agostinho, when Mr. Balbuena came back from looking for -- going to the address that was listed for Mira Construction, what did he tell you?
A. Huber Construction.

Q. I'm sorry. Huber Construction.  What did he tell you?

A. Well, he came back and says, "Hey, we have a problem here. I went to this address. This is a little apartment in the middle of nowhere. There's no one that lives there that, you know, knows anything about this company. They don't know who this guy is.  So we got a problem on our hands."

(Dkt. 558, pg. 72).

ff.  The following are questions posed by the government during redirect of

Agostinho:

BY MR. GRIMBERG:

Q. Is that true?

A. That's true.

Q. What did you understand that to mean?

A. That I can cash a check that I received from the contractors I worked for, go there and cash it.

Q. Why would you need to run a check from outside your own company?

A. Not to -- in my opinion, obviously, not to run it through my books.

Q. Well, did you understand that to be legal?

A. No.

Q. What was your understanding?

A. That's not legal.

Q. And you knew that at the time?

A. Yes.

Q. And you know that now?

A. Yes.

Q. And was there any question in your mind about the legality of that?

A. No.

Q. And those are Mr. Caro's words?

A. Yes.

Q. Now, when Yuri came back after meeting with Mr. Caro, did he have a company that he now miraculously worked for?

A. Yes.

Q. What was the name of that company?

88

MR. BLACK: Objection. Move to strike the characterization, your Honor.

MR. GRIMBERG: Withdrawn. It's argumentative.

BY MR. GRIMBERG:

Q. What was the name of that company?

A. I can't tell you, because I --

THE COURT: Are you rephrasing the question?

MR. GRIMBERG: Yes.

THE COURT: Okay.

BY MR. GRIMBERG:

Q. What was the name of the company?

A. I don't remember. He came in with a business card with a company. I can't remember the name of it.

Q. Did he subsequently -- I believe you said that he subsequently used a different company.

A. Correct.

Q. And that different company was also provided by his contacts from Rene Caro. Correct?

A. That is correct.

Q. What was the name of that company?

A. Huber Construction.

(Dkt. 558, pgs. 173-174).

gg. This is a repeat of I. (Dkt. 559, pgs. 143-44).

hh. This is a repeat of BB. (Dkt. 548, pgs. 79-80).

In the reply brief, Caro further mentions other questionable comments by the government. Those are included in this list.

ii. In the rebuttal argument, the government made the following comments:

They started suggesting in their questions that Mr. Donadio wasn't going to be prosecuted as a result of this cooperation agreement that he had with the Government.

You also recall that, when we actually showed you the cooperation agreement, it said no such thing, and that none of these people have been promised that they're not going to be prosecuted.

You notice that the questioning in that area dropped off after the first letter because everybody got the same letter.

And, in fact, the evidence that you have is that Mr. -- that Agent Rondon testified that there's at least 15 pending investigations as a result of this. This doesn't end here.

So the idea that these people somehow came to testify -- when I say "these people," Joseph Dieppa, Rodrigo Donadio, Adelino Agostinho, Mario Varela -- the people who have nothing to do with Mr. Obispo, the people who dealt directly with La Bamba, somehow are getting a pass on this and their testimony is not to be believed is disingenuous.

(Dkt. 528, pg. 28).

jj. In the rebuttal argument, the government made the following comments:

The IRS doesn't record, and neither does the FBI. They don't record interviews because, if the tape machine breaks, the batteries go, you didn't press the right button, you've got nothing.

And one of the many reasons you don't do it in this particular case is because they're at the scene of a search warrant and the agents are getting in and out of the car, back and forth.

And then what? Then we'd be here saying, "Well, every time you turned off the tape recorder, you did so so [*sic*] that he could say something else" or, "What he was really saying was...." We'd have that whole series of things. That's why the agents sit there and they take notes.

And to suggest that there was something nefarious about that, that this is the first criminal case in recorded history that somebody's confession wasn't recorded, is disingenuous because he knows that that's not true.

Let's talk about Mr. Chaoui's defenses.

Mr. Chaoui's lawyer says that Mr. Chaoui was not paid under the table. And, you know, again, Mr. Chaoui's not charged with income tax evasion.

90

No one has suggested he got paid under the table or didn't get paid under the table.

(Dkt. 528, pg. 31).

kk. In the rebuttal argument, the government made the following comments:

We heard from Ralph Tillman. And let me just clarify a couple of things.

The argument was that the Government was angry that Ralph Tillman testified. And, yes, we were angry. We were angry that he was shown the trial transcripts from other witnesses, including Peter Djinis's, in order to craft his testimony at trial.

You're not allowed to do that, and that's what pissed us off, that you were allowed to read the other expert's testimony and them come in and figure out what you had to say the opposite of what the other witness said. You don't do that.

We were angry that he was still an IRS agent at the time we were investigating La Bamba, and that's not right. You compromise -- you have to think back and wonder, "Was our investigation compromised in any way?"

We're not angry at his testimony. He says what he's going to say. He's not an attorney. He's opining about legal issues on agency and things that he's just simply not qualified to opine on. He's qualified to opine about IRS matters because he worked there for 34 years.

(Dkt. 528, pgs. 39-40).

ll. In the rebuttal argument, the government made the following comments:

So, number one, if you thought that video showed something different, you could have played it.

Number two, I don't show videotapes. You're absolutely right. I do not show videotapes of what other people are saying to witnesses. That's improper. That's what they did with Mr. Tillman. That's not what I do.

I'm not going to show Monica Ruiz a series of videotapes with other people speaking on them and then have her -- influence her testimony and say what I want her to say on the stand.

I prepare every single witness that comes in here. I try not to waste your time and the Court's time. I'm organized. I come in. I meet with all my witnesses. We go through, "Here's what we're going to go through."

I went through with Mr. Obispo all of these tapes. I played the ones that I thought were relevant, that showed illegal conduct.

But I meet with all of my witnesses. There's nothing wrong with that. And the defense met with their witnesses.

To suggest somehow that I, you know, tampered with the evidence in some way by preparing witnesses for testimony is disingenuous. Everybody does it, and it's correct. That's what you're supposed to do.

(Dkt. 528, pgs. 47-48).

mm.    During closing argument, the government made the following comments referring to Tillman:

He had been personally involved with La Bamba when he worked for the IRS. He had examined La Bamba in 1999 and 2001. Both were done under his supervision. Both times he found them to be in violation of the Bank Secrecy Act.

He testified about his theory on agency, but he acknowledged that it's his own personal opinion. He acknowledged that there's no statute, there's no case, there's no regulation that he is relying on for this theory.

In fact, he acknowledged that the agency who is in charge of interpreting --

MR. HERNANDEZ: I'm going to object to that, your Honor. That misrepresents the testimony.

THE COURT: Overruled.

MR. GRIMBERG: He acknowledged that the agency that is responsible for interpreting the Bank Secrecy Act, for deciding what is and is not appropriate is FinCen, FinCen.

Remember, Peters Djinis was the former director of FinCen. And Mr. Tillman, of course, could not explain how La Bamba could have been justified in the CTRs that . . . .

(Dkt. 526, pg. 149).

nn.     During rebuttal argument, the government made the following statements:

The defense says that Peter Djinis agreed with Obispo -- that Obispo was an agent of La Bamba. They say that to suggest that there's a conflict among the experts.

First of all, it's apples and oranges. You've got on the one hand Peter Djinis, who's an attorney and the former deputy director of FinCEN, the agency that rules over all of this. That's why he was asked to come and give expert testimony: "Here's what the law is in this area."

What Mr. Garvin did was, in a hypothetical, suggest that Obispo was a truck driver, just like the La Bamba truck drivers. And in that scenario, the question was, "Do you have to do a CTR -- when La Bamba gives money to the people in the truck to go out and spend money, do you need to do a CTR?"

(Dkt. 528, pgs. 41-42).

oo.     During cross examination of defense witness Esther Crespo, the government asked the following questions.

Q. Good morning, Ms. Crespo. Nice to see you.
A. Good morning. How are you?
Q. Ms. Crespo, you are a -- you're a certified translator for both the courts and for private hire.
Correct?
A. Yes, sir.

(Dkt. 518, pg. 18).

pp.    During rebuttal argument, the government made the following statements:

> What about La Bamba's defenses? "We only committed a little bit of fraud," the "needle in a haystack" argument.
>
> The Government charges that 132 million of CTRs filed by La Bamba were done so falsely and it was done so knowingly and willfully, knowing these companies were fictitious, to assist those people in avoiding paying income taxes. It's limited to those 15 companies, and the total is 132 million.
>
> That's what -- that's what La Bamba reported. That's what the bank records show. That's what their logs show.
>
> At no point did the Government suggest that it was $600 million. The indictment says that La Bamba filed $600 million in CTRs in 2006 and 2007. It doesn't say those were false. It says they filed 600 million. The indictment says 132 million of those were false.
>
> The defense has come back and presented a chart saying that, "Well, you think that's bad? We cashed $600 million in 2007 alone." But that's not what's charged in the indictment.
>
> So why isn't La Bamba -- and you'll also note in the jury instructions there's no little bit of fraud exception. If you've got a little bit of fraud and a lot of other cases, that somehow makes it better. It's like being a little pregnant. You either are or you aren't.
>
> So why isn't La Bamba still in business? You heard six different times during opening and closing statements by the attorneys that 62 employees are out of work, the Government shut La Bamba down.
>
> But did you hear any evidence that the Government shut La Bamba down? That's because we didn't. That's why La Bamba is charged in this indictment.

(Dkt. 528, pgs. 18-19).

qq.    During the cross examination of defense witness Ruben Pedron, the government asked the following questions:

94

BY MR. FERNANDEZ:

Q. Good afternoon, Mr. Padron (verbatim).

A. Good afternoon. It's "Pedron," with an "E."

Q. "Pedron." "Pedron."

If I could ask you just a couple of questions, I looked at -- looked you up on the Internet very briefly and I know that you have been with SunTrust for approximately 25 years, 27 years. Is that correct?

A. That's correct.

Q. You've done a number of charitable and civic works within the community?

A. Yes.

Q. I noticed that you hosted a real estate panel for the Miami Gay & Lesbian conference about a year ago.  Correct?

A. Yeah. That's true. About 18 months ago, I think.

Q. So you've done a lot of work in the community.  You've done some civic activities.

You are comfortable with the prosecution for bank fraud and tax evasion and that sort of thing? Do you understand where that's coming from?

A. I mean, I have some idea. Sure.

(Dkt. 518, pgs. 123-24).

rr.   During the cross examination of Russell Weigel, the government asked the following questions.

A. That's a difficult question to answer, Mr. Fernandez.

I mean, there have been times when, in my opinion, I have not allowed cases to go forward that were, in my opinion, not thoroughly investigated.

There have been times when I have thought that -- I mean, cases were authorized and things had come to light afterwards.

Unfortunately, in the investigative process, not everything is brought to light. A lot of times things come out during the process of litigation and sometimes, at that point, it's too late to -- institutionally to deauthorize a case.

Q. Most of your --
A. That has happened.
Q. I'm sorry.
Most of your experience is in the civil arena, though; is it not?
A. Most is. Yes.
Q. As a state attorney, when it was someone's liberty that was at stake, would you ever prosecute
someone who you didn't think was guilty?

(Dkt. 519, pg. 149).

ss.   During the cross examination of Russell Weigel, the government asked the following questions.

BY MR. FERNANDEZ:
Q. Mr. Weigel, finally, the last questions we were talking about, what kind of case was it that was nolle pros'ed?
A. A theft case.
Q. How many witnesses, if you remember?
A. I have no idea at this point. I just remember the events.
Q. Do you remember how long you investigated it?
A. In that particular case, I believe I was handed the file maybe 24 to 48 hours before trial.
MR. FERNANDEZ: I have no further questions,
Judge. Thank you.

(Dkt. 519, pg. 152).

tt.   This portion of the transcript pertains to cross examination of a government witness and contains no objectionable comments by the government.

(Dkt. 563, pgs. 166, 170).

uu.   During opening arguments, the government made the following comments.

Mr. Obispo will also tell you that the day that law enforcement -- the day that Special Agents William Rondon and Alfonso Herrera came knocking on his door with a search warrant, that he confessed.

He confessed to the scheme, he confessed to his role in the scheme, and he confessed to what they already suspected, which is that he was working together with the folks at La Bamba.

And Mr. Obispo decided to do the right thing. He decided to help law enforcement –

(Dkt. 545, pg. 46).

vv.   During rebuttal argument, the government made the following statements:

Let's talk about Miguel Obispo a little bit, who suddenly is this smooth and savvy liar who came to -- who convinced the Government in order to save himself.

First of all, the Government didn't need any convincing. The Government was convinced that La Bamba was committing fraud before Mr. Obispo got there.  Mr. Obispo confirmed the fact that the fraud was being conducted at La Bamba through eight months of . . . .

(Dkt. 528, pg. 8).

ww.   During rebuttal argument, the government made the following statements:

You can evaluate their credibility, their testimony, what their motivation is to lie. I will tell you that I think it takes a special type of person to come into federal court and admit to conspiring and filing millions of dollars in checks and not having paid taxes on them.

So you can take that as you will. What's their motivation to lie in contrast with the Defendants' motivation to criticize them and make a story?

The Government only gave you half of Monica Ruiz's statement from Alfredo Gonzalez. I gave --Monica Ruiz testified what

97

she remembered. She said that he told her when she asked about the commission statements -- commission checks, "Better not to ask."

I don't know what Mr. Gonzalez is talking about, because he testified that he doesn't remember that conversation. So it's not a matter of whether it was half a conversation or a full conversation. It's simply he doesn't remember it. But that's what Monica told us.

And I'll talk more about Monica in a second.

Mr. Alter says that Gonzalez's confession, now, wasn't really a confession. Yet, you had -- and you, of course, expect someone -- what else are you going to say when you've got a written confession facing you? You're going to say, "Well, that's not really what I meant." I understand that.

But the facts are that two professional, experienced IRS agents met with him the day of the arrest. They sat down in the car and they conducted an interview.

Each agent took contemporaneous, detailed notes about what was said, which both the notes and the memo that was prepared, based on those notes, were turned over to defense counsel.

And now -- and defense counsel used those notes to cross-examine some of the witnesses. But now, when Mr. Gonzalez takes the stand, "Oh, I didn't say any of that. That's not really what I said. I've been misinterpreted. That's not really" -- and he claims he never actually saw a CTR until after his arrest, but the day of his arrest he admitted that he knew that the people conducting the transactions weren't the people that are being reported on the CTRs.

But now he's had a memory lapse, and I understand that.

But the fact that he didn't -- we didn't record the interview -- Mr. Alter's been doing this for 30 years and he knows better than that.

(Dkt. 528, pgs. 29-31). Additional portions of this argument are also contained in JJ.

xx. During closing argument the government made the following statement:

"In this case, we submit to you that it's a distinction with no difference. All of the

Defendants knew what they were doing was illegal. All of them." (Dkt. 526, pgs. 161-62).

yy. These statements are contained in U.

zz. During redirect of Dieppa, the following exchange occurred:

A. The only time I ever saw the agent again was when I went to the US Attorney's Office.
Q. Okay. And when was that?
A. It was later that month.
Q. Did you tell the truth during that meeting?
A. Yes, sir.
Q. And did you explain the inconsistencies with what you had told them during your initial meeting and what you were telling them at that second meeting?
A. I did.
Q. Did you have a subsequent meeting with the agents or the prosecutors in the case?
A. I believe we had a second meeting -- a third meeting.
Q. Okay. Did you tell the truth during that meeting?
A. Yes, sir.
Q. And was what you said during that meeting consistent with what you had told the agents at theUS Attorney's Office during your second meeting?
MR. BLACK: Objection.
THE COURT: Sustained.
Rephrase your question.
BY MR. GRIMBERG:
Q. Did you tell the truth?
A. Yes, sir.
MR. BLACK: Objection.
THE COURT: Sustained.
MR. BLACK: Move to strike.
THE COURT: The motion to strike is granted.

99

The jury is instructed to disregard the
question and answer.
BY MR. GRIMBERG:
Q. Now, since you have been retained by an attorney, have you been
candid and honest with law enforcement regarding all of their
questions concerning this case?
MR. BLACK: Objection.
THE WITNESS: Yes, sir.
THE COURT: Grounds?
MR. BLACK: Conclusion of the witness.
THE COURT: Overruled.
MR. BLACK: And vouching.
THE COURT: I'm sorry?
MR. BLACK: And vouching.
THE COURT: Sustained as to vouching.
MR. GRIMBERG: I'll move on, your Honor.
BY MR. GRIMBERG:
Q. There was some discussion during the cross-examination about
Byron Garcia.

(Dkt. 558, pgs. 172-74).

aaa.    Caro points to a portion of the record that does not support his
assertion.  (Dkt. 346, pgs. 111-12).

bbb.    Caro points to a portion of the record that does not support his
assertion.  (Dkt. 343, pg. 237).

ccc.  This claim is identical to that raised in XX.

ddd.  During rebuttal argument, the government stated:

The 493 tapes were made available to the defense more than a year ago,
complete with a 60-page index of every single tape, the date they were recorded
and the people speaking on the tape.

If there's another tape out there that says something different than what we showed, they could have very easily played those tapes.

(Dkt. 528, pg. 7).

eee.  During rebuttal argument, the government stated:

You heard a reference to a State audit that was done by the State of Florida.

And then you heard in Mr. Black's closing statements references to Barbara Rodriguez. Barbara Rodriguez ran a company called SAS Compliance.

Mr. Black suggested that Ms. Rodriguez would have said X, Y and Z about the audit at La Bamba.  But you didn't hear from Barbara Rodriguez. She didn't testify in the case.

So that whole idea of what Barbara Rodriguez might have or could have said is not before you.

But the audit that she did found deficiencies in what La Bamba was doing. He said, overall, they had compliance manuals, they had a compliance officer, they had the elements that they needed. But she found certain deficiencies and gave them an overall satisfactory rating.

(Dkt. 528, pgs. 15-16).

fff.  During cross examination of Chaoui, the following occurred:

Q. Now, let me see if I understand this correctly.
You read this ruling to suggest that you didn't have to do a CTR on Miguel Obispo because Miguel Obispo was an agent of La Bamba. Correct?
A. Part of it -- with a what -- I'm sorry. I'm sorry. I read this ruling in 2006.
Q. Correct.
A. That wasn't pertaining at that time to Mr. Obispo.
Q. Okay. So I don't understand your testimony, then.
You said that the reason the CTRs were false is because you thought, as a result of this letter ruling, you didn't have to file a CTR on Miguel Obispo.

101

MR. GARVIN: Your Honor, I object to the --
THE COURT: Sustained.
Rephrase your question.

(Dkt. 522, pg. 64).

In the context of a trial that lasted from November 2, 2008, until February 10, 2009, there is no government misconduct here. Some of the comments may have been unwise, but none of them constituted prosecutorial misconduct and none, separately or combined, would have impacted the outcome of the trial.

### 7. Severance Motion

According to Caro, the District Court erred in denying his motion for severance because this allowed prejudicial spillover from co-Defendant Gonzalez's post-arrest statement.

Caro and La Bamba filed a Motion to Sever that centered on statements made by Gonzalez to IRS agents on January 18, 2008. In denying the motion (Dkt. 238), the District Court explained there was no Bruton issue because the government "intend[ed] to introduce only those portions of Defendant Gonzalez's statements that incriminate him alone . . . ."[41]

---

[41] A Bruton issue involves the admission of a non-testifying co-defendant's confession which directly implicates a defendant. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

IRS Agent Alfonso Herrera testified about Gonzalez's statement to the IRS. Following that testimony, Caro's counsel objected and asked for a severance of the trial. Counsel contended that while Gonzalez's statement did not directly implicate Caro, it pointed to him indirectly. After a sidebar, the District Court gave the following instruction to the jury: "[t]he evidence that you've just heard is evidence that is being submitted in the case of the United States versus Alfredo Gonzalez. It is not to be considered by you in any way against any other Defendant." (Dkt. 563, pg. 119).

"It is well settled that defendants who are indicted together are usually tried together." United States v. Browne, 505 F.3d 1229, 1268-1269 (11th Cir. 2007). Therefore, we are "generally reluctant to second-guess the District Court's decision on severance." Id. A District Court's denial of a motion to sever is reviewed for an abuse of discretion. Id. To "show such an abuse," a moving party must discharge the "'heavy burden' of demonstrating 'compelling prejudice' from the joinder." Id. (citing United States v. Novaton, 271 F.3d 968, 989 (11th Cir.2001)(quoting United States v. Pepe, 747 F.2d 632, 651 (11th Cir.1984))). The Browne Court, further, explained:

> [T]he Supreme Court set forth a two-step test to determine whether a defendant is entitled to a new trial due to a district court's refusal to sever prior to trial or to grant a mistrial once trial has commenced. A defendant must first demonstrate that the joint trial resulted in

prejudice to him; and second, must show that severance is the proper remedy for that prejudice. Under this test, [t]here are only two circumstances in which severance is the only permissible remedy: where there is a serious risk that a joint trial (1) would compromise a specific trial right of one of the defendants, or (2) would prevent the jury from making a reliable judgment about guilt or innocence.

Browne, 505 F.3d at 1268-1269 (internal quotations and citations removed).

Caro has not met this heavy burden; especially considering the District Court instructed the jury to consider the evidence against no other defendant but Gonzalez.

### 8. Extrinsic Evidence and the Jury

Caro argues the District Court erred in failing to declare a mistrial where jury deliberations were tainted by extrinsic evidence, consisting of unredacted transcripts of conversations between Caro and Obispo that were not admitted during the trial.

When the jury retired to deliberate, the parties agreed that all the evidence admitted would be given to the jury for their use, with the exception of two CDs for October 31, and November 14, 2007. The conversations on these two CDs had been redacted for use before the jury, but the CDs contained the unredacted parts. The accompanying transcripts for those CDs had been redacted, and those redacted transcripts were given to the jury.

However, less than a week into its deliberations, the foreperson sent a note to the District Court stating that "we are looking through all the evidence provided. The original transcripts are in there with nothing blacked out.  Is this right?" (Dkt. 533, pg. 3).  After consultation with the parties, the District Court removed the evidence from the jury room for inspection.  (Dkt. 533, pg. 7).  During this inspection, it was discovered that two unredacted transcripts had been included in the evidence provided to the jury, along with the two redacted transcripts to use as trial aids.  (Dkt. 533, pgs. 8-12).

The government compared the two versions and identified three matters contained in the unredacted transcripts:  (1) payment of "money under the table" for Caro's purchase of Cash Flow; (2) references to another investigation; and (3) the fate of Pronto Cash and its owner who was having a "problem."[42]  (Dkt. 533, pgs. 15-17).  The parties and the District Court agreed that the inclusion of the unredacted transcripts was unintentional.  (Dkt. 533, pgs. 18-21).

The District Court inquired whether the jurors had read the unredacted transcripts.  (Dkt. 533, pgs. 22, 29).  The foreperson explained that Juror 12 had read part of the November 14 unredacted transcript and "she realized what it was." (Dkt. 533, pg. 38).  Juror 12 alerted the foreperson whereupon he wrote the note to

---

[42]  Pronto Check Cashing was also under investigation by the FBI.

the court. *Id.* at 39. After the note, the jury stopped deliberations and the unredacted transcripts had not been used further as part of the deliberations. *Id.* at 40. The foreperson was clear that this was the first occasion that any juror examined the box of transcripts. (Dkt. 533, pgs. 42-43).

Juror 12 was questioned by the District Court. While going through a box of transcripts, she began reading the unredacted transcript. Id. at 44. She did not recall all of the material she was reading from the trial, and noticed the transcript contained no "blacked out" parts. Id. at 44. Juror 12 informed the foreperson of her discovery. Id. Juror 12 recalled that Pronto Check Cashing was discussed in the transcript. Id. at 45-46. She did not discuss what she had read with the other jurors, id. at 46, and Juror 12 was clear that prior to her review of the transcript no other juror had looked at it. Id. at 49.

The District Court granted Caro's motion to strike Juror 12. Id. at 67. The court and the parties then focused on how to proceed. Counsel for Gonzalez asked what would be done with the verdicts the jury had reached on two of the defendants. Id. at 68. The District Court explained, "whatever happens, whether it's 11 or whether it's 12 [jurors], I'm taking the verdicts, destroying them and going to reinstruct them and tell them to begin their deliberations anew . . . ." Id. at 69.

106

The District Court dismissed Juror 12. The remaining eleven jurors were asked whether anyone else had looked at the unredacted transcripts. Id. at 83. The District Court received no response. Id. At that time, the District Court also confiscated the completed verdict forms from the jury, and indicated they would not be read but shredded. Id. Thereupon the jury was excused for a long weekend. Id. at 83-84.

Upon returning from the weekend, the foreperson provided the District Court with the following note:

> Judge Lenard: I originally believed that [Juror 12] was the only juror who read parts of the original November 14th transcript.
>
> I since became aware that two other jurors also read parts of this transcript. When you called all the jurors into the courtroom and asked if anyone else had read the transcript, I expected them to say something.
>
> I did not feel comfortable pointing them out in front of the whole court.
>
> I should have sent you a note when I first became aware. I cannot, however, remain silent.

(Dkt. 534, pgs. 3-4). With the parties' agreement, the District Court interviewed the jurors individually and learned that Jurors 7 and 8 had known about the transcript.[43] (Dkt. 534, pgs. 10-20, 23-25).

---

[43] Juror 1 indicated that, in addition to Juror 12, she observed "Aubrey" read the unredacted transcripts. (Dkt. 534, pg. 10). Juror 2 indicated that, in addition to Juror 12, she

Juror 7 stated that she had not actually read the transcript, but glanced over Juror 8's shoulder while he was reading it. Id. at 20. Only the word "Pronto" stood out to Juror 7, but she could not tell what it was regarding, nor did she "actually read the transcript." (Dkt. 534, pg. 20). Juror 8 had not read the transcript, although he had "looked over at it" while Juror 12 was reading it. (Dkt. 534, pg. 21).

The District Court granted the request to strike Juror 8 and replaced him with an alternate. (Dkt. 534, pgs. 26-27). The District Court noted that although there was no request to strike Juror 7, what she had read was "de minimis" with regard to "Pronto," which, in any event, had not been included in the portion of the Motion in Limine that had been granted. (Dkt. 534, pgs. 27-28, 51-52).

At this point, Caro requested a mistrial on the ground that heightened attention to the unredacted transcript had created a "pollutive effect on the entire jury." (Dkt. 534, pg. 29). That motion was denied. (Dkt. 534, pg. 31).

After determining the two alternative jurors had not engaged in deliberations with the other jurors, the District Court convened the ten remaining jurors,

saw "Aubrey" and "Kim" read the unredacted transcripts. Id. at 11. Juror 3 indicated that Aubrey "glanced" at the unredacted transcripts. Id. at 12-13, 18-19. Juror 4, the foreperson, believed that "Aubrey" and "Kim," Jurors 7 and 8, read the transcript. Id. at 13. Juror 5 indicated that he saw "Aubrey" read the unredacted transcripts. Id. at 17. Juror 6 indicated that Aubrey had seen the unredacted transcripts. Id. at 18. Jurors 9 did not see anyone else besides Juror 12 reading the unredacted transcripts. Id. at 24. Jurors 10 and 11 did not read or discuss the unredacted transcripts with anyone. Id. at 24-25.

108

explained that it had dismissed Juror 8, and directed them to begin deliberations anew with the two alternates. (Dkt. 534, pgs. 43-46). The District Court assembled the entire reconstituted jury and instructed them anew. (Dkt. 534, pgs. 53-85). Three days later, the jury returned its verdict. (Dkt. 538, pgs. 8-20).

A denial of a motion for mistrial is reviewed for an abuse of discretion. Emmanuel, 565 F.3d at 1334. Moreover, we review "the denial of a motion for a new trial based on the jury's exposure to extrinsic evidence for abuse of discretion." United States v. Ronda, 455 F.3d 1273, n. 33 (11th Cir. 2006).

"A mistrial or new trial is required only if the extrinsic evidence known by the jury posed a reasonable possibility of prejudice to the defendant." Ronda, 455 F.3d at 1299 (11th Cir. 2006) (citing United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir.1984)). "The defendant has the burden to show that the jury has been exposed to extrinsic evidence or extrinsic contacts. Once the defendant establishes that such exposure in fact occurred, prejudice is presumed and the burden shifts to the government to rebut the presumption." Id.

"To rebut the presumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant." Id. "To evaluate whether the government has rebutted that presumption, we consider the totality of the circumstances surrounding the introduction of the extrinsic evidence

109

to the jury." Id. at 1299-1300. "The factors we consider include: (1) the nature of the extrinsic evidence; (2) the manner in which the information reached the jury; (3) the factual findings in the district court and the manner of the court's inquiry into the juror issues; and (4) the strength of the government's case." Id. at 1300.

The District Court's conscientious investigation of the extrinsic evidence and the jurors who saw it put that court in the best position to determine whether or not any juror misconduct deprived Caro of his due process right to a fair trial. The District Court individually questioned each member of the jury, and replaced the two jurors who had seen the unredacted transcripts for more than a passing glance. The reconstituted jury was then directed to start deliberations anew.[44]

The only juror who rendered a verdict who had any contact with the unredacted transcript could not have been affected by her reading the word "Pronto." Therefore, the government met its burden of demonstrating that the unredacted transcript evidence was harmless to Caro, and the District Court did not abuse its discretion in denying the motion for new trial. We conclude the District

---

[44] The action comports with the requirements of Fed. R. Crim. Proc. 24(c)(3) which provides:

> The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.

Court properly exercised its discretion in finding that Caro's jury was free of any legitimate taint from the extrinsic evidence.

### 9. Destruction of Verdict

Caro makes one additional claim arising from this extrinsic evidence. Caro claims that the District Court abridged his protection against double jeopardy by disposing of the partial verdict from the original jury.

The District Court charged the jury and they began deliberations on Friday, January 23, 2009. (Dkt. 528, pg. 106) On Wednesday, January 28, 2009, the fourth day of deliberations, the jury provided the District Court with the following note: "Judge Lenard, We have reached a verdict on two Defendants on all counts. We have been unable to reach a verdict on the other two Defendants. We are at an impasse. No unanimous decision on Count 1 or any of the substantive charges related to these Defendants." (Dkt. 531, pgs. 4-5).

The District Court sought the advice of counsel since Fed. R. Crim. Proc. 31(b)(1) permits a jury to return a partial verdict at anytime in a multiple defendant case. (Dkt. 531, pg. 5). Caro's counsel maintained, "We see no purpose to be served by taking a verdict at this time as to the two Defendants that they have decided on." Id. at 7. Caro's counsel explained, "The reason that we do not think the verdicts should be taken at this time is the jury always has the right during

deliberations to revisit and, if they choose to revisit and they've given the verdict over, it may not be -- it takes it away from them." Id. at 7-8.

After considering the parties' positions, the District Court concluded that "I don't find that it would be appropriate to fully return the verdict at this time, since I'm going to be instructing them to continue to deliberate." Id. at 8. The jury would be instructed that to give verdict forms to the court and they would be sealed. Id. at 9. There were no objections to this course of action. Id. at 9, 11.

Ultimately, the District Court instructed the jury that she was taking the completed verdict forms and was "going to shred them."[45] (Dkt. 533, pg. 83). There was no objection to this suggested course of action.

Under the invited error doctrine, however, we will not consider an argument on appeal when the party making the argument invited or induced the District Court into making the alleged error. Love, 449 F.3d at 1157 (declining to consider an argument that a term of supervised release was excessive when the defendant acknowledged in the plea agreement that the term was proper and argued for supervised release at sentencing).

Caro's counsel could have objected to the District Court's proposed action of shredding the verdict, but chose not to. This failure should not permit Caro to

---

[45] The record is unclear as to when these verdict forms were actually destroyed.

112

now raise this issue. Moreover, though an initial result on two defendants was delivered to the trial judge, it was not a final verdict published in open court with no juror dissent. See United States v. Acevedo, 141 F.3d 1421, 1424 n.6 (11th Cir. 1998). As such, there was no event which terminated the original jeopardy and the jury was free to continue deliberations with a substitute juror, pursuant to Federal Rule of Criminal Procedure 24(c).

At the time the unredacted evidence issue arose, Caro's counsel argued that the District Court should not take a partial verdict. Counsel argued to the District Court that the jurors could actually change the verdict during further deliberations, and they wanted the jury to be able to do just that. So, Caro actually asked the court not to accept the partial verdict and wait until the jury had completed all of its deliberations, and take whatever verdict they had reached at that later time. The destruction of the partial verdict by the District Court is exactly what Caro's counsel requested.

### 10. Instructions to the Jury

Caro argues that the District Court erroneously denied defense requests for various jury instructions. The instructions that should have been given, according to Caro, were: (1) an instruction on the law of agency; (2) a good faith theory of defense, and reliance on a FinCen advisory opinion; (3) an instruction on specific

intent as an element of the substantive CTR filing offenses; and (4) an instruction on "the relationship between prosecutorial discretion to reduce sentences and potential partisanship or bias by cooperating witnesses" (Blue brief, pg. 77). Caro, additionally, argues that the District Court should not have given a deliberate ignorance instruction.[46]

We review *de novo* the correctness of jury instructions. Prather, 205 F.3d at 1270. A district court has "broad discretion in formulating a jury charge as long as the charge as a whole is a correct statement of the law." United States v. Perez-Tosta, 36 F.3d 1552, 1565 (11th Cir. 1994). A conviction will not be reversed on this ground "unless we find that issues of law were presented inaccurately or the charge improperly guided the jury in such a substantial way as to violate due process." Id.

However, a District Court's refusal to give a requested instruction is reviewed for an abuse of discretion. Yeager, 331 F.3d at 1222. A denial of a requested jury instruction is reversible error only where the requested instruction: "(1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the

---

[46] The initial and reply brief are not the picture of clarity on these issues. Despite being granted permission to file a brief of up to 19,000 words, Appellants have failed to use those words with clarity, and we are left to decipher the claims alleged.

requested instruction seriously impaired the defendant's ability to conduct his defense." Eckhardt, 466 F.3d at 947-48.

Nevertheless, a district court "is not bound to use the exact words and phrasing requested by defense counsel in its jury charge." United States v. Gonzalez, 975 F.2d 1514, 1517 (11th Cir. 1992). When deciding if the difference in the requested instruction and the one actually given is significant, we "need only ascertain whether the charge, when viewed as a whole, fairly and correctly states the issues and the law." Id.

### a. Agency Instruction

Caro requested an instruction on an agency relationship.[47] The District Court denied the requested agency instruction because it was substantially covered by the agency charge given.[48] (Dkt. 524, pgs. 31-32).

---

[47] The requested instruction was:

> The law provides that an agency relationship is created by an agreement, written or oral, express or implied, by which the persons agree that one of them is to act for, or in the place of, the other. The person who agrees to act for an-other is called the agent, and the other is called the principal.

> The existence of an agency relationship can be proved by deductions or inferences. It is not the law that an agency relationship can only be proven by the minutes of its board of directors or by a contract in writing.

(Dkt. 337, pg. 4).

[48] The instruction given by the District Court was:

Caro provided the District Court with no binding support for his contention that such an instruction is permissible in a criminal proceeding; nor does he do so now.  Accordingly, we conclude the District Court did not abuse its discretion in denying the requested instruction.

### b.  Good Faith Defense/Reliance on a FinCen Opinion

---

The law recognizes that, ordinarily, anything a person can do for one's self may also be accomplished through direction of another person as an agent or by acting together with or under the direction of another person or persons in a joint effort.

So if the acts or conduct of an agent, employee or other associate of the defendant are willfully directed or authorized by the defendant or if the defendant aids and abets another person by willfully joining together with that person in the commission of a crime, then the law holds the defendant responsible for the conduct of that other person just as though the defendant had personally engaged in such conduct.

(Dkt. 528, pgs. 58-59).

Caro requested jury instructions on good faith.[49] This

[49] Caro's requested two instructions on good faith; one pertaining to the substantive counts and one to the count of conspiracy. Caro's general instruction provided:

> Good faith or reasonable reliance is a complete defense to the charge in the indictment since good faith on the part of the Defendant is inconsistent with the existence of the intent required to find the Defendant guilty of the charged offenses. The burden of proof is not on the Defendant to prove good faith, of course, since the Defendant has no burden to prove anything.
>
> So, a Defendant would not be possess [*sic*] the intent to do wrong if, before taking any action with regard to the alleged offense, the Defendant relied in good faith on employees whom the Defendant considered competent to gather information, prepare, and file Currency Transaction Reports on Treasury Department, FINCEN Form 104, the employees possessed or had access to all material facts that the Defendant had to comply with the currency transaction reporting requirements, and the Defendant had no knowledge or reason to believe that any material omission or misstatement of fact was contained in currency transaction reports filed.
>
> If you find that a Defendant acted in good faith or reasonably relied upon a competent employee, you should find the Defendant not guilty.

(Dkt. 337, pg. 7). Whereas, the conspiracy instruction that was given to the jury provided:

> The indictment charges the Defendants with conspiracy to willfully and knowingly committing the following offenses against the United States:
>
> (a) willfully violating the reporting requirements of Title 31, United States Code, Section 5313(a), and Title 31, Code of Federal Regulations, Sections 103.22 and 103.28, as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period, by filing a report required by Title 31, United States Code, Section 5313(a), specifically, a Currency Transaction Report on Treasury Department, FINCEN Form 104, that contained a material omission and misstatement of fact concerning, among other things, the true identity of the parties involved in the financial transactions and the source of the funds involved, in violation of Title 31, United States Code, Section 5322(b); and
>
> (b) knowingly and for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a), and regulations prescribed thereunder, causing a domestic financial institution to file a report under Title 31, United States Code, Section 5313(a), and regulations prescribed thereunder, that

instruction was premised upon Chaoui's testimony that he consulted the FinCen website where he located FinCen Ruling 2003-3. That ruling, according to Chaoui explained that La Bamba was not required to file a CTR for a money transfer from Western Union to La Bamba.

The District Court granted Caro's request (Dkt. 524, pgs. 7-9) and charged the jury on good-faith reliance, according to each defendant's individual

---

is, a Currency Transaction Report on Treasury Department, FINCEN Form 104, that contained a material omission and misstatement of fact concerning, among other things, the true identity of the parties involved in the financial transactions and the source of the funds involved, as part of a pattern of illegal activity involving more than $100,000 in a 12 month period, in violation of Title 31, United States Code, Sections 5324(a)(2) and (d)(2), and Title 31, Code of Federal Regulations, Section 103.22 and 103.28.

Good faith is a complete defense to the charges in the indictment since good faith on the part of the Defendant is inconsistent with the intent required to prove the Defendants willfully and knowingly conspired to commit the above offenses. The burden of proof is not on the Defendant to prove good faith, of course, since the Defendant has no burden to prove anything. The Government must establish beyond a reasonable doubt that the Defendant acted with specific intent charged in Count I of the indictment.

One who expresses an honestly held opinion, or an honestly formed belief, that currency transaction reports they filed or caused to be filed did not contain a material omission or misstatement of fact concerning, among other things, the true identity of the parties involved in the financial transactions, the source of the funds involved or the location of the transaction, is not chargeable with under Count I even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence which establishes only that a person made a mistake in judgment, or was careless, does not establish that a Defendant knowingly or willfully made material false or material omissions or misstatements of fact on currency transaction reports for the purpose of evading the transaction reporting requirements.

(Dkt. 337, pgs. 8-9).

circumstances.  (Dkt. 528, pgs. 70-73).  The District Court, however, did not rely upon Caro's proposed instruction, but gave a modified version of the pattern good-faith defense jury instruction.[50]  A review of these two instructions demonstrates that the District Court fairly and correctly stated the applicable law to the jury.  The

---

[50]  The instruction given by the District Court explained:

Good faith is a complete defense to the charges in counts 1 and counts 18-33 in the Superseding Indictment, since good faith on the part of a Defendant is inconsistent with willfulness, which is an essential part of the charges in counts 1 and 18-33.

The burden of proof is not on a defendant to prove his good faith, of course, since he has no burden to prove anything. The Government must establish beyond a reasonable doubt that a defendant acted willfully as charged in the Superseding Indictment in count 1 and counts 18 through 33.

One who expresses an honestly held opinion or an honestly formed belief is not chargeable with willful intent, even though the opinion is erroneous or the belief is mistaken. And similarly, evidence which establishes only that a person made a mistake in judgment or an error in judgment or was careless does not establish willful intent.

On the other hand, an honest belief on the part of a defendant that a particular business practice was authorized and permitted by law would not in and of itself constitute good faith as used in these instructions if in carrying out that practice the defendant, as charged in Count 1, knowingly and willfully agreed with other persons to:

1) willfully violate the reporting requirements of Title 31, 5313(a), or;

2) knowingly and for the purpose of evading the reporting requirements filed CTRs containing material omissions or misstatements of fact or;

as charged in Counts 18 through 33, willfully violated the reporting requirements of Title 31, Section 5313(a).

(Dkt. 397, pg. 23).

119

failure to give the exact instruction requested by Caro was not an abuse of discretion.

Furthermore, the absence of an instruction on Caro's good-faith-reliance on the FinCen opinion was properly rejected because even Chaoui, the only defendant who had raised the defense, had conceded that the FinCen ruling that he had relied on was "limited to licensed money-transmitters and their--the transfer of money between licensed money transmitter and their agents," and was totally divorced from the question how a CTR should be filed by La Bamba, thereby rendering the requested instruction inapplicable to the case. (Dkt. 523, pg. 36).

The District Court determined that there was no justification for the charge because Chaoui had testified that he had never consulted an attorney or accountant about the regulations and that he made an independent decision about how to prepare and file the CTRs for the cash that La Bamba advanced to Cash Flow based upon the FinCen opinion. (Dkt. 523, pgs. 56-57).

### c. Specific Intent Instruction

According to Caro, the District Court's failure to give a specific intent instruction prejudiced him. It is Caro's view that he was charged under "complex and ambiguous" regulations that required the District Court to instruct the jury of his actual knowledge of the regulatory burden.

120

The District Court declined to give Caro's requested instruction,[51] concluding that it incorrectly stated the law. The District Court opted instead to utilize the definition of purposefully from United States v. Bailey, 444 U.S. 394, 100 S. Ct. 624, 62 L. Ed. 2d. 575 (1980). (Dkt. 523, pgs. 10-11).[52] Thereafter, counsel for both Caro and La Bamba explained they had no objection to this resolution. (Dkt. 523, pg. 11).

Under the invited error doctrine we will not consider this argument. Love, 449 F.3d at 1157. Even if we were to consider this claim, we reverse a conviction

---

[51] Caro's requested instruction was:

When these instructions require you to determine if [*sic*] act was done "purposely" or for the purpose of evading a law, it means that you must determine if the act was committed voluntarily and willfully, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.

(Dkt. 327, pg. 5).

[52] The instruction given to the jury explained:

The word "knowingly," as that term is used in the Superseding Indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

The word "willfully," as that term is used in the Superseding Indictment or in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the law.

A person who causes a particular result is said to act " purposefully" if he consciously desires that result, whatever the likelihood of that result happening from his conduct.

(Dkt. 397, pgs. 30-31)

on the basis of a jury instruction only if "we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003). The jury was advised adequately of the requisite intent through the inclusion of the "willingness" instruction. (Dkt. 528, pg. 76).

### d. Prosecutorial Discretion

Caro requested that the District Court specifically instruct the jury regarding prosecutorial discretion.[53] The justification for this instruction was that it would accurately describe for the jury the prosecutor's discretion in seeking the reduction of a cooperative witness' testimony. The District Court declined to give this instruction, opting instead to rely upon the standard instructions addressing witness bias.[54] A review of these instructions demonstrate that the District Court

---

[53] Caro's requested instruction provided:

The law provides that a prosecutor has broad discretion in deciding what, if any, charge to bring or not to bring, against any individual that commits an offense against the United States. The law further provides that a prosecutor has the sole discretion to request reduction of a cooperating witness's potential or existing sentence.

(Dkt. 327, pg. 6).

[54] The District Court gave the following instructions:

Now, in saying that you must consider all of the evidence, I do not mean that you must accept all of the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in

part. Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: Did the witness impress you as one who was telling the truth? Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? Did the witness seem to have a good memory? Did the witness have the opportunity and ability to observe accurately the things he or she testified about? Did the witness appear to understand the questions clearly and answer them directly? Did the witness's testimony differ from other testimony or other evidence?

You should also ask yourself whether there was evidence tending to prove that a witness testified falsely concerning some important fact; or, whether there was evidence that at some other time a witness said or did something, or failed to say or do something, which w as different from the testimony the witness gave before you during the trial.

The fact that a witness has been convicted of a felony offense, or a crime involving dishonesty or false statement, is another factor you may consider in deciding whether you believe that witness.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether it was simply an innocent lapse of memory or an intentional falsehood; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

\* \* \*

The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.

For example, a paid informer, or a witness who has been promised that he or she will not be charged or prosecuted, or a witness who hopes to gain more favorable treatment in his or her own case, may have a reason to make a false statement because the witness wants to strike a good bargain with the Government.

So, while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other

123

fairly and correctly stated the applicable law to the jury. The failure to give the exact instruction requested by Caro was not an abuse of discretion.

### e. Deliberate Ignorance

Caro maintains the District Court erroneously gave a deliberate ignorance instruction.

We have explained that for a deliberate ignorance instruction to be proper, "'it must be based upon facts which would point in the direction of deliberate ignorance.'" United States v. Rivera, 944 F.2d 1563, 1571 (11th Cir. 1991) (quoting United States v. Aleman, 728 F.2d 492 (11th Cir. 1984)). A deliberate ignorance instruction "is appropriate when 'the facts . . . support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.'" Id. (quoting United States v. Alvarado, 838 F.2d 311, 314 (9th Cir. 1987)). This instruction should not be given when the evidence points only to actual knowledge, id., but "'the evidence supports both actual knowledge and deliberate ignorance, the instruction is

---

witnesses.

(Dkt. 397, pgs. 5-7).

124

properly given.'" United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (quoting United States v. Ochoa-Fabian, 935 F.2d 1139, 1142 (10th Cir. 1991)).

In this case, the record is clear that the deliberate ignorance instruction was properly given because there was clear evidence that supported actual knowledge along with deliberate ignorance. A significant part of Caro's defense was that he relied upon Becerra and other lower-level employees to file the CTR's for La Bamba.

Whereas, others testified regarding Caro's active role in the scheme. The government introduced evidence that Valle, a co-conspirator and co-defendant, set up a number of shell companies through which he filed false CTRs with La Bamba. Other witnesses testified they used La Bamba to cash checks through fictional companies for the purpose of avoiding taxes. Some of the corporate officers of these fictitious companies, for example, Marvin Marroquin and Eduardo Olivar, testified that they were never in La Bamba even though La Bamba filed CTRs for millions of dollars that reported them as being present for the transactions.

Witnesses also testified that they participated in the filing of false CTRs with Caro personally. Rodrigo Donadio testified that he had received the name of his shell company, Mira, directly from Caro, and received specific instructions from

Caro to fax copies of checks payable to shell companies directly to La Bamba, and that cash was then delivered to Donadio by Chaoui. Adhelino Agostinho testified that he worked directly with Caro to write checks to shell companies to avoid paying taxes and workers' compensation. Mario Edgardo Varela Rivera testified to the same and specifically identified Caro as one of the individuals that cashed the checks. Dieppa testified that Caro prepared and provided to him false invoices for shell companies to circumvent bank scrutiny, and that Caro instructed Dieppa to switch from one shell company to another, because Dieppa had written "too many checks" to a particular shell company. Therefore, the District Court properly gave the deliberate ignorance instruction.

## 11. Cumulative Error

Predictably, Caro contends all the errors discussed above resulted in cumulative error. No cumulative errors exist here. United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004)(citing United States v. Allen, 269 F.3d 842, 847 (7th Cir. 2001)("If there are no errors or a single error, there can be no cumulative error.")).

## VI. SENTENCING ISSUES[55]

---

[55] The sentencing arguments raised in Appellants' briefs pertain only to Caro's sentence, not La Bamba's. Accordingly, we need not consider La Bamba's position in this respect. See Jernigan, 341 F.3d at 1284 n.8.

Caro raises three issues regarding his 216 months sentence. First, Caro alleges the District Court erred in finding that he was an organizer or leader of the conspiracy for which he was convicted, and applying a corresponding four-level enhancement. Next, Caro argues that the District Court similarly erred in applying a three-level enhancement for obstruction of justice for his attempt to have a co-conspirator "remove" certain records from his files, asserting that the District Court failed to (1) consider his motive; and (2) explicitly find that the records were material to his prosecution. Finally, Caro argues that his total sentence was procedurally and substantively unreasonable.

## A. Leadership Enhancement

Generally, "[a] district court's enhancement of a defendant's offense level based on his role as an organizer or leader is a finding of fact reviewed for clear error." United States v. Rendon, 354 F.3d 1320, 1331 (11th Cir. 2003). The government bears the burden of proving applicability of an aggravating role enhancement by a preponderance of the evidence. Yeager, 331 F.3d at 1226.

Where "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," a four-level enhancement applies. U.S.S.G. § 3B1.1(a). Thus, two elements must be met: (1) the defendant must be an organizer or leader; and (2) the conspiracy must involve

five or more people or be otherwise extensive. United States v. Martinez, 584 F.3d 1022, 1026 (11th Cir. 2009).

Regarding the first element, a § 3B1.1 enhancement is appropriate as long as the defendant "asserted control or influence over at least one other participant in the crime." Campa, 529 F.3d at 1013 (internal quotation omitted). The commentary to § 3B1.1 states that, in "distinguishing a leadership and organizational role from one of mere management or supervision," the court should consider: (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment. (n.4).

Regarding the second element, a "'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1); see also United States v. Njau, 386 F.3d 1039, 1041 (11th Cir. 2004) (holding that the manner of certain individuals' assistance in distributing counterfeit social security cards evidenced their knowledge of the scheme and made them "participants" for sentencing purposes). For a conspiracy

128

to exist, "there is no requirement that each conspirator participated in every transaction, knew the other conspirators, or knew the details of each venture making up the conspiracy." United States v. Taylor, 17 F.3d 333, 337 (11th Cir. 1994).

The trial record reflects that Caro was personally involved in establishing the shell corporations that were the focus of the conspiracy, training other participants how to fill out the CTRs that misrepresented the nature of the transactions, was sought out by co-conspirators to make decisions, and actively recruited numerous other co-conspirators. In addition, as reflected in the evidence, the conspiracy had far above the requisite five or more participants needed for this enhancement. Accordingly, we hold that the District Court did not clearly err in applying a four-level leadership enhancement.

## B. Obstruction-Of-Justice Enhancement

We review a District Court's finding of fact regarding an obstruction-of-justice enhancement for clear error, but review *de novo* the application of the guidelines to those facts. United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006).

A two-level obstruction-of-justice enhancement is appropriate if "the defendant willfully obstructed . . . the administration of justice with respect to the

investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The guidelines list numerous forms of conduct that may merit an obstruction enhancement, noting that the list is non-exhaustive. See id. comment (n.4). One form of listed conduct is "destroying or concealing or directing . . . another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." Id. comment. (n.4(d)). The guidelines add that if conduct occurred contemporaneously with arrest, it shall not warrant enhancement unless it materially hindered the criminal proceedings against the offender. Id.

An obstruction enhancement is justified against a defendant who instructs another to manipulate records if the evidence suggests that the ultimate goal was to conceal criminal wrongdoing, regardless of whether the defendant uses words such as "destroy" or "alter." United States v. Tampas, 493 F.3d 1291, 1304 (11th Cir. 2007) (holding that defendant's instructions to "reconcile" records in an attempt to conceal his embezzlement warranted an obstruction enhancement as an attempt to produce a false record). Nevertheless, District Courts "'must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.'" United States v. Gupta, 572 F.3d 878, 888 (11th Cir. 2009)(quoting United States v. Sepulveda, 115F.3d 882, 890 (11th Cir. 1997)).

130

Caro's challenge to an obstruction enhancement is without merit. Even assuming that his admitted attempt to have a co-conspirator "remove" certain relevant records from his files was done for benign reasons, he cites no authority supporting his proposition that the District Court was bound to find that his motivation excused his obstructive conduct. Nor does he cite any authority to support his argument that the District Court had to explicitly find that the records were "material" to his prosecution. Accordingly, we hold that the District Court did not err in applying a three-level obstruction enhancement.

## C. Reasonableness

Where appropriate, we examine a defendant's sentence for both procedural and substantive reasonableness under an abuse of discretion standard, taking into account the totality of the circumstances. Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597, 169 L. Ed. 2d 445 (2007).

"Specifically, the district court must impose a procedurally and substantively reasonable sentence." United States v. Gonzalez, 550 F.3d 1319, 1323 (11th Cir. 2008). A sentence is procedurally unreasonable if the district court fails to calculate or improperly calculates the guidelines range, treats the guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails to explain adequately the chosen sentence,

including an explanation for any deviation from the guideline range. United States v. Livesay, 525 F.3d 1081, 1091 (11th Cir. 2008). A sentence is substantively unreasonable "if it does not achieve the purposes of sentencing stated in § 3553(a)." United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008) (internal quotation omitted).

Pursuant to § 3553(a), the sentencing court shall impose a sentence "sufficient, but not greater than necessary," to comply with the purposes of sentencing listed in § 3553(a)(2), namely, reflecting the seriousness of the offense; promoting respect for the law; providing just punishment for the offense; deterring criminal conduct; protecting the public from future criminal conduct by the defendant; and providing the defendant with needed educational or vocational training or medical care. 18 U.S.C. § 3553(a)(2). The sentencing court must also consider the following factors in determining a particular sentence: the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the applicable guideline range; the pertinent policy statements of the Sentencing Commission; the need to avoid unwanted sentencing disparities; and the need to provide restitution to victims. See id. § 3553(a)(1), (3)-(7). We defer to the district court's judgment regarding the weight

132

given to each § 3553(a) factor, unless the district court has made "a clear error of judgment" under the facts of a particular case. Gonzalez, 550 F.3d at 1324.

"[W]hen the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005). A sentencing court need only "set forth enough to satisfy the appellate court that [it] . . . has a reasoned basis for exercising [its] own legal decisionmaking authority." Livesay, 525 F.3d at 1090 (internal quotation omitted).

"[T]he language of the Sentencing Guidelines is to be given its plain and ordinary meaning." United States v. Garey, 546 F.3d 1359, 1361 (11th Cir. 2008)(internal quotations omitted)(holding that the defendant was subject to a 12-level enhancement under the plain language of the applicable guideline and accompanying commentary, despite his attempt to add an element). The guidelines provide that people convicted of knowingly filing false CTRs, as well as other offenses involving the evasion of reporting requirements, are subject to a base offense level of 6, plus the number of offense levels from § 2B1.1's table pertaining to theft and fraud corresponding to the value of the funds. U.S.S.G. § 2S1.3(a)(2). "For purposes of this guideline, 'value of the funds' means the amount of the funds *involved in the . . . reporting conduct*." Id. comment. (n.1)

(emphasis added). Per the table cross-referenced in § 2B1.1, if the amount is greater than $100 million, but less than $200 million, 26 offense levels are added. U.S.S.G. § 2B1.1(b)(1)(N).

Upon careful review of the record and the parties arguments, we affirm Caro's total sentence in this regard. Insofar as Caro alleged that his sentence was procedurally unreasonable due to the application of U.S.S.G. § 2S1.3 and the corresponding loss calculation, that guideline explicitly contemplated his offense of conviction, and the District Court calculated the loss according to its plain language.

Substantively, the record reflects that the District Court did not abuse its discretion. Caro's 216-month sentence was over 6 years shorter than the applicable guideline minimum, and was far less than the potential 130 years he could have received if the District Court chose to run all of the statutory maximums consecutively. [56] See 18 U.S.C. § 371; 31 U.S.C. § 5324(d)(2).

Moreover, the District Court noted the need to impose a sentence of consequence to send a message to the community that white collar crime of the type Caro perpetrated caused real harm by forcing taxpayers to pay more and

---

[56] The District Court calculated Caro's offense level to be 40, with a criminal history category I. The advisory guidelines range applicable to Caro was 292 to 365 months' of incarceration, followed by two to three years of supervised release. (Dkt. 565, pg. 66). Both Caro and the government agreed with these calculations. Id.

damaging competition in local markets, and could not be tolerated. (Dkt. 566 pgs. 56-57) see also 18 U.S.C. § 3553(a)(2). To the extent the District Court emphasized these factors, Caro provides no reason why such emphasis represented a clear error in judgment. Gonzalez, 550 F.3d at 1324.

Furthermore, Caro presented extensive arguments in mitigation and several witnesses, which the district court acknowledged considering. (Dkt. 565, pgs. 68-129; Dkt. 566, pgs. 4-28, 59-60). Its ultimate sentence reflected that the seriousness of the offense and a need to make an impact was tempered in part by Caro's personal characteristics—namely, his lack of criminal history and respectable work in the community—as well as the unique situation in which two of his employees received three-year sentences after their mistrial and subsequent guilty pleas. (Dkt. 566, pgs. 53-55, 58). Based on these considerations, the District Court exercised a reasoned basis for its decision that a 216-month sentence was sufficient, but not greater than necessary to comply with § 3553(a). See Livesay, 525 F.3d at 1090; Pugh, 515 F.3d at 1191. Accordingly, we hold that Caro's 216-month total sentence was reasonable.

## VII. CONCLUSION

The convictions and sentences of Juan Rene Caro and Maytemar Corporation, d/b/a La Bamba Check Cashing are **AFFIRMED.**

135